APEX HOSIERY CO. *v.* LEADER ET AL.*

No. 638.   Argued April 1, 2, 1940.—Decided May 27, 1940.

*William Leader and American Federation of Full Fashioned Hosiery Workers, Philadelphia, Branch No. 1, Local No. 706, respondents.

470

*Mr. Sylvan H. Hirsch,* with whom *Messrs. Allen J. Levin, Arno P. Mowitz,* and *Stanley Folz* were on the brief, for petitioner.

476

*Mr. Isadore Katz* for respondents.

By leave of Court, briefs of *amici curiae* were filed by *Mr. Louis B. Boudin,* on behalf of the Labor Law Committee of the National Lawyers Guild; by *Messrs. John F. Finerty* and *Morris Shapiro* on behalf of the Workers Defense League; and by *Messrs. Lee Pressman, Joseph Kovner,* and *Anthony Wayne Smith* on behalf of the Congress of Industrial Organizations, in support of the judgment below.

MR. JUSTICE STONE delivered the opinion of the Court.

Petitioner, a Pennsylvania corporation, is engaged in the manufacture, at its factory in Philadelphia, of hosiery, a substantial part of which is shipped in interstate commerce. It brought the present suit in the federal district court for Eastern Pennsylvania against respondent Federation, a labor organization, and its officers, to recover treble the amount of damage inflicted on it by respondents in conducting a strike at petitioner's factory alleged

to be a conspiracy in violation of the Sherman Anti-Trust Act. 26 Stat. 209, 15 U. S. C. § 1. The trial to a jury resulted in a verdict for petitioner in the sum of $237,310, respondents saving by proper motions and exceptions the question whether the evidence was sufficient to establish a violation of the Sherman Act. The trial judge trebled the verdict to $711,932.55, in conformity to the provision of the Sherman Act as amended by § 4 of the Clayton Act, 1914, 38 Stat. 731, 15 U. S. C. § 15, and gave judgment accordingly. The Court of Appeals for the Third Circuit reversed, 108 F. 2d 71, on the ground that the interstate commerce restrained or affected by respondents' acts was unsubstantial, the total shipment of merchandise from petitioner's factory being less than three per cent. of the total value of the output in the entire industry of the country, and on the further ground that the evidence failed to show an intent on the part of respondents to restrain interstate commerce. We granted certiorari, 309 U. S. 644, the questions presented being of importance in the administration of the Sherman Act.

The facts are undisputed. There was evidence from which the jury could have found as follows. Petitioner employs at its Philadelphia factory about twenty-five hundred persons in the manufacture of hosiery, and manufactures annually merchandise of the value of about $5,000,000. Its principal raw materials are silk and cotton, which are shipped to it from points outside the state. It ships interstate more than 80 per cent. of its finished product, and in the last eight months of 1937 it shipped in all 274,791 dozen pairs of stockings. In April, 1937, petitioner was operating a non-union shop. A demand of the respondent Federation at that time for a closed shop agreement came to nothing. On May 4, 1937, when only eight of petitioner's employees were members of the Federation, it ordered a strike. Shortly after midday on

May 6, 1937, when petitioner's factory was shut down, members of the union, employed by other factories in Philadelphia who had stopped work, gathered at petitioner's plant. Respondent Leader, president of the Federation, then made a further demand for a closed shop agreement. When this was refused Leader declared a "sit down strike." Immediately, acts of violence against petitioner's plant and the employees in charge of it were committed by the assembled mob. It forcibly seized the plant, whereupon, under union leadership, its members were organized to maintain themselves as sit-down strikers in possession of the plant, and it remained in possession until June 23, 1937, when the strikers were forcibly ejected pursuant to an injunction ordered by the Court of Appeals for the Third Circuit in *Apex Hosiery Co.* v. *Leader,* 90 F. 2d 155, 159; reversed and dismissal ordered as moot in *Leader* v. *Apex Hosiery Co.,* 302 U. S. 656.

The locks on all gates and entrances of petitioner's plant were changed; only strikers were given keys. No others were allowed to leave or enter the plant without permission of the strikers. During the period of their occupancy, the union supplied them with food, blankets, cots, medical care, and paid them strike benefits. While occupying the factory, the strikers wilfully wrecked machinery of great value, and did extensive damage to other property and equipment of the company. All manufacturing operations by petitioner ceased on May 6th. As the result of the destruction of the company's machinery and plant, it did not resume even partial manufacturing operations until August 19, 1937. The record discloses a lawless invasion of petitioner's plant and destruction of its property by force and violence of the most brutal and wanton character, under leadership and direction of respondents, and without interference by the local authorities.

For more than three months, by reason of respondents' acts, manufacture was suspended at petitioner's plant

and the flow of petitioner's product into interstate commerce was stopped. When the plant was seized, there were on hand 130,000 dozen pairs of finished hosiery, of a value of about $800,000, ready for shipment on unfilled orders, 80 per cent. of which were to be shipped to points outside the state. Shipment was prevented by the occupation of the factory by the strikers. Three times in the course of the strike respondents refused requests made by petitioner to be allowed to remove the merchandise for the purpose of shipment in filling the orders.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." Only a single question is presented by the record for our decision, whether the evidence which we have detailed, whose verity must be taken to be established by the jury's verdict, establishes a restraint of trade or commerce which the Sherman Act condemns.

It is not denied, and we assume for present purposes, that respondents by substituting the primitive method of trial by combat,[1] for the ordinary processes of justice and more civilized means of deciding an industrial dispute, violated the civil and penal laws of Pennsylvania which authorize the recovery of full compensation and impose criminal penalties for the wrongs done. But in this suit, in which no diversity of citizenship of the parties is alleged or shown, the federal courts are without authority to enforce state laws. Their only jurisdiction is to vindicate such federal right as Congress has conferred on petitioner by the Sherman Act and violence,

[1] This Court has recently characterized the encouraging, aiding and abetting the strikers in similar unlawful acts as a "high-handed proceeding without shadow of legal right," see *Labor Board* v. *Fansteel Corp.*, 306 U. S. 240, 252.

as will appear hereafter, however reprehensible, does not give the federal courts jurisdiction.

At the outset, and before considering the more substantial issues which we regard as decisive of this cause, it is desirable to remove from the field of controversy certain questions which have been much argued here and below, but which we think, in the circumstances of the present case, are irrelevant to decision. We find abundant support for petitioner's contention that the effect of the sit-down strike was to restrict substantially the interstate transportation of its manufactured product, so as to bring the acts of respondents by which the restriction was effected within the reach of the commerce power if Congress has seen fit to exercise it. Cessation of petitioner's manufacturing operations, which respondents compelled, indubitably meant the cessation of shipment interstate. The effect upon the commerce resulted naturally and inevitably from the cause. The occupancy of petitioner's factory by the strikers prevented the shipment of the substantial amount of merchandise on hand when the strike was called. In point of the immediacy of the effect of the strikers' acts upon the interstate transportation involved and of its volume, the case does not differ from many others in which we have sustained the Congressional exercise of the commerce power. The national power to regulate commerce is not restricted to that which is nationwide in its scope. Here the strikers' activities were as closely related to interstate commerce and affected it as substantially as numerous other activities not in themselves interstate commerce which have nevertheless been held to be subject to federal statutes enacted in the exercise of the commerce power.[2] More recently,

---

[2] *Montague & Co.* v. *Lowry*, 193 U. S. 38; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Comm'n*, 221 U. S. 612, 619; *Southern Ry. Co.* v. *United States*, 222 U. S. 20; *Houston, E. & W. T. Ry. Co.* v. *United States*, 234 U. S. 342; *Chicago Board of Trade* v. *Olsen*, 262

where the statute was by its terms applicable and the question was of Congressional power, we have sustained the application of the Wagner Act, 49 Stat. 449, 29 U. S. C. §§ 151–166, regulating labor relations "affecting" interstate commerce to situations no more closely related to the commerce than these, and where the interstate commerce affected was no greater in volume.[3]  And in the application of the Sherman Act, as we have recently had occasion to point out, it is the nature of the restraint and its effect on interstate commerce and not the amount of the commerce which are the tests of violation. See *United States* v. *Socony-Vacuum Oil Co., ante,* p. 224, note 59. Cf. *Labor Board* v. *Fainblatt,* 306 U. S. 601, 606.

We think also, as petitioner contends, that the jury's verdict must be taken as a finding supported by evidence that respondents intended to prevent petitioner's shipments in interstate commerce in the sense that respondents must be taken to have intended the natural and probable consequences of their acts.  The trial court left it to the jury to say whether the respondents intended to restrain petitioner's interstate shipments, and charged that in a suit to recover damages for violation of the Sherman Act it was necessary for it to find an intent on the part of respondents to cause the prohibited restraint of commerce,[4] but that such intent might be inferred

U. S. 1; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334; *United States* v. *Carolene Products Co.,* 304 U. S. 144, 147; *Currin* v. *Wallace,* 306 U. S. 1; *Mulford* v. *Smith,* 307 U. S. 38.

[3] *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 38–40; *Labor Board* v. *Fruehauf Trailer Co.,* 301 U. S. 49; *Labor Board* v. *Friedman-Harry Marks Clothing Co.,* 301 U. S. 58; *Santa Cruz Packing Co.* v. *Labor Board,* 303 U. S. 453, 463 *et seq.; Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197; *Labor Board* v. *Fainblatt,* 306 U. S. 601, 604 *et seq.*  See *Labor Board* v. *Crowe Coal Co.,* 104 F. 2d 633; *Labor Board* v. *Good Coal Co.,* 110 F. 2d 501.

[4] *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 342; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 243;

from their acts in stopping petitioner's manufacture of a product largely and regularly shipped in interstate commerce. Concededly the purpose of the strikers and their principal objective were to compel petitioner to yield to their demands for a union shop, but it is a matter of common knowledge and experience that the stoppage of a large manufacturing plant, which the strikers did intend, whose product is distributed generally to consumers throughout the country, would prevent its shipments in interstate commerce. We must take it from the jury's verdict that this was known to the strikers as well as to others. In addition there was specific testimony that the strikers refused to permit the withdrawal of the finished merchandise from petitioner's factory for shipment.

But the Sherman Act admittedly does not condemn all combinations and conspiracies which interrupt interstate transportation. *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344 (*First Coronado* case); *United Leather Workers* v. *Herkert Co.* 265 U. S. 457 (*Leather Workers* case). In *In re Debs*, 158 U. S. 564, 600, this Court declined to consider whether the stoppage of trains on an interstate railroad resulting from a strike, was a violation of the Sherman Act—a question which it has not since been called on to decide.[5] It is not seriously

United States v. Patten, 226 U. S. 525, 543; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 468; Industrial Association of San Francisco v. United States, 268 U. S. 64, 77; Bedford Cut Stone Co. v. Journeymen Stone Cutters Assn., 274 U. S. 37; cf. Labor Board v. Jones & Laughlin, 301 U. S. 1, 40.

[5] The public interest in protecting interstate transportation from interference by strikes, recognized in the *Debs* case, 158 U. S. 564, independently of the Sherman law, has since been protected by legislation specially directed to that end. See, e. g., Erdman Act, 30 Stat. 424 (1898); Newlands Act, 38 Stat. 103 (1913); Title III, Transportation Act of 1920, 41 Stat. 456, 469; Railway Labor Act of 1926, 44 Stat. 577; Railway Labor Act of 1934, 48 Stat. 1185, 45 U. S. C. §§ 151–163. See *Virginian Ry.* v. *Federation*, 300 U. S. 515,

contended here that a conspiracy to derail and rob an interstate train, even though it were laden with 100,000 dozen pairs of stockings, necessarily would involve a violation of the Sherman Act. This Court has never applied the Act to laborers or to others as a means of policing interstate transportation, and so the question to which we must address ourselves is whether a conspiracy of strikers in a labor dispute to stop the operation of the employer's factory in order to enforce their demands against the employer is the kind of restraint of trade or commerce at which the Act is aimed, even though a natural and probable consequence of their acts and the only effect on trade or commerce was to prevent substantial shipments interstate by the employer.

A point strongly urged in behalf of respondents in brief and argument before us is that Congress intended to exclude labor organizations and their activities wholly from the operation of the Sherman Act. To this the short answer must be made that for the thirty-two years which have elapsed since the decision of *Loewe* v. *Lawlor,* 208 U. S. 274, this Court, in its efforts to determine the true meaning and application of the Sherman Act has repeat-edly held that the words of the act, "Every contract, combination . . . or conspiracy in restraint of trade or commerce" do embrace to some extent and in some circumstances labor unions and their activities; [6] and that during that period Congress, although often asked to do so, has passed no act purporting to exclude labor unions

---

545, 553; *United States* v. *Lowden,* 308 U. S. 225, 236. I Sharfman, The Interstate Commerce Commission, 100–102, notes 39, 40.

[6] *Loewe* v. *Lawlor,* 208 U. S. 274; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Lawlor* v. *Loewe,* 235 U. S. 522; *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443; *Coronado Coal Co.* v. *United Mine Workers,* 268 U. S. 295; *United States* v. *Brims,* 272 U. S. 549; *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37; *Local 167* v. *United States,* 291 U. S. 293.

wholly from the operation of the Act.[7]   On the contrary Congress has repeatedly enacted laws restricting or purporting to curtail the application of the Act to labor organizations and their activities, thus recognizing that to some extent not defined they remain subject to it.[8]

Whether labor organizations and their activities are wholly excluded from the Sherman Act is a question of statutory construction, not constitutional power.[9]   The long time failure of Congress to alter the Act after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one.   This is the more so where, as here, the application of the statute

[7] Eleven bills introduced in Congress shortly after passage of the Sherman Act providing, among other things, for the exemption of labor from provisions of the Act, failed of enactment.   They are H. R. 6640, in the 52nd Congress; H. R. 10539 in the 56th Congress; H. R. 11667 in the 56th Congress; S. 649 and H. R. 14947 in the 57th Congress; S. 1728, H. R. 89, H. R. 166, and H. R. 2636 in the 52nd Congress; H. R. 7938 in the 55th Congress and H. R. 11988 in the 57th Congress.   The sole purpose of another bill, S. 1546, 55th Congress, was to amend the act so as to exempt all labor organizations from its prohibitions.   Copies of these bills are printed in Bills and Debates Relating to Trusts, Sen. Doc. 147, 57th Cong., 2d Sess. 1902–1903, pp. 465 and 411, 469 and 449, 473 and 431, 477 and 417, 481, 581, 949, 953, 987 and 999.

[8] See e. g. § 6 of the Clayton Act, 38 Stat. 731, (1914); restrictions on appropriations, 38 Stat. 53 (1913); 44 Stat. 1194 (1927).

For detailed account of the Congressional history see Frankfurter and Greene, The Labor Injunction (1930), pp. 139–144.

[9] Cf. comment on the labor anti-trust cases in *A. L. A. Schechter Poultry Co.* v. *United States*, 295 U. S. 495, 548: ". . . these decisions related to the *applicability of the federal statute and not to its constitutional validity*, . . ." and in *Labor Board* v. *Jones & Laughlin Co.*, 301 U. S. 1, 40, in discussing the *First Coronado* case it was said "that it had not been shown that the activities there involved— a local strike—brought them within the provisions of the Anti-Trust Act, . . ."   (Italics supplied.)

to labor unions has brought forth sharply conflicting views both on the Court and in Congress, and where after the matter has been fully brought to the attention of the public and the Congress, the latter has not seen fit to change the statute.

While we must regard the question whether labor unions are to some extent and in some circumstances subject to the Act as settled in the affirmative, it is equally plain that this Court has never thought the Act to apply to all labor union activities affecting interstate commerce. The prohibitions of the Sherman Act were not stated in terms of precision or of crystal clarity and the Act itself did not define them. In consequence of the vagueness of its language, perhaps not uncalculated,[10] the courts have been left to give content to the statute, and in the performance of that function it is appropriate that courts should interpret its word in the light of its legislative history and of the particular evils at which the legislation was aimed. Cf. *Standard Oil Co.* v. *United States,* 221 U. S. 1; *Nash* v. *United States,* 229 U. S. 373; *Appalachian Coals* v. *United States,* 288 U. S. 344, 359, 360.

---

[10] See Debates, 21 Cong. Rec. 2460, 3148; 2 Hoar, Autobiography of Seventy Years 364; Senator Edmunds, *The Interstate Trust and Commerce Act of 1890,* 194 No. Am. Rev. 801, 813, "after most careful and earnest consideration by the Judiciary Committee of the Senate it was agreed by every member that it was quite impracticable to include by specific description all the acts which should come within the meaning and purpose of the words 'trade' and 'commerce' or 'trust,' or the words 'restraint' or 'monopolize,' by precise and all-inclusive definitions; and that these were truly matters for judicial consideration."

See also Senator Hoar who with Senator Edmunds probably drafted the bill (see A. H. Walker, History of the Sherman Law (1910), p. 27–28) in 36 Cong. Rec. 522, Jan. 6, 1903: "We undertook by law to clothe the courts with the power and impose on them and the Department of Justice the duty of preventing all combinations in restraint of trade. It was believed that the phrase, 'in restraint of trade,' had a technical and well-understood meaning in the law."

The critical words which circumscribe the judicial performance of this function so far as the present case is concerned are "Every . . . combination . . . or conspiracy in restraint of trade or commerce." Since in the present case, as we have seen, the natural and predictable consequence of the strike was the restraint of interstate transportation the precise question which we are called upon to decide is whether that restraint resulting from the strike maintained to enforce union demands by compelling a shutdown of petitioner's factory is the kind of "restraint of trade or commerce" which the Act condemns.

In considering whether union activities like the present may fairly be deemed to be embraced within this phrase, three circumstances relating to the history and application of the Act which are of striking significance must first be taken into account. The legislative history of the Sherman Act as well as the decisions of this Court interpreting it, show that it was not aimed at policing interstate transportation or movement of goods and property. The legislative history and the voluminous literature which was generated in the course of the enactment and during fifty years of litigation of the Sherman Act give no hint that such was its purpose.[11] They do not suggest

---

[11] See the Bibliography on Trusts (1913) prepared by the Library of Congress. Cf. Homan, "Industrial Combination as Surveyed in Recent Literature," 44 Quart. J. Econ., 345 (1930). With few exceptions the articles, scientific and popular, reflected the popular idea that the Act was aimed at the prevention of monopolistic practices and restraints upon trade injurious to purchasers and consumers of goods and services by preservation of business competition. See e. g. Seager and Gulick, Trusts and Corporation Problems (1929), 367 et seq., 42 Ann. Am. Acad., Industrial Competition and Combination (July, 1912); P. L. Anderson, Combination v. Competition, 4 Edit. Rev. 500 (1911); Gilbert Holland Montague, Trust Regulation Today, 105 Atl. Monthly, 1 (1910); Federal Regulation of Industry, 32 Ann. Am. Acad. of Pol. Sci., No. 108 (1908) passim; Clark, Federal Trust Policy (1931), Ch. II, V; Homan, Trusts, 15 Ency. Soc. Sciences 111, 113, "clearly the law was inspired by the predatory competitive tactics of the great trusts and its primary purpose was

that, in general, state laws or law enforcement machinery were inadequate to prevent local obstructions or interferences with interstate transportation, or presented any problem requiring the interposition of federal authority.[12] In 1890 when the Sherman Act was adopted there were only a few federal statutes imposing penalties for obstructing or misusing interstate transportation.[13] With an expanding commerce, many others have since been enacted safeguarding transportation in interstate commerce as the need was seen, including statutes declaring conspiracies to interfere or actual interference with interstate commerce by violence or threats of violence to be felonies.[14] It was another and quite a different evil at

the maintenance of the competitive system in industry." See also, Shulman, Labor and the Anti-Trust Laws, 34 Ill. L. Rev. 769; Boudin, The Sherman Law and Labor Disputes, 39 Col. L. Rev. 1283; 40 Col. L. Rev. 14.

[12] There was no lack of existing law to protect against evils ascribed to organized labor. Legislative and judicial action of both a criminal and civil nature already restrained concerted action by labor. See e. g. the kinds of strikes which were declared illegal in Pennsylvania, including a strike accompanied by force or threat of harm to persons or property, Brightly's Purdon's Digest of 1885, pp. 426, 1172.

For collection of state statutes on labor activities, see Report of the Commissioner of Labor, *Labor Laws of the Various States* (1892); Bull. 370, *Labor Laws of the United States with Decisions Relating Thereto*, United States Bureau of Labor Statistics (1925); Witte, The Government in Labor Disputes (1932), 12–45, 61–81.

[13] Three statutes covered in 1890 the Congressional action in relation to obstructions to interstate commerce. A penalty was imposed for the refusal to transmit a telegraph message (R. S. § 5269, 17 Stat. 366 (1872)), for transporting nitroglycerine and other explosives without proper safeguards (R. S. § 5353, 14 Stat. 81 (1866)) and for combining to prevent the continuous carriage of freight, 24 Stat. 382, 49 U. S. C. § 7.

[14] See e. g. regulation of: interstate carriage of lottery tickets, 28 Stat. 963 (1895), 18 U. S. C. § 387; transportation of obscene books, 29 Stat. 512 (1897), 18 U. S. C. § 396; transportation of illegally killed game, 31 Stat. 188 (1900), 18 U. S. C. §§ 392–395; interstate

which the Sherman Act was aimed. It was enacted in
the era of "trusts" and of "combinations" of businesses

shipment of intoxicating liquors, 35 Stat. 1136 (1909), 18 U. S. C.
§§ 388–390; white slave traffic, 36 Stat. 825 (1910), 18 U. S. C. §§
397–404; transportation of prize-fight films, 37 Stat. 240 (1912), 18
U. S. C. §§ 405–407; larceny of goods moving in interstate com-
merce, 37 Stat. 670 (1913), 18 U. S. C. § 409; violent interference
with foreign commerce, 40 Stat. 221 (1917), 18 U. S. C. § 381;
transportation of stolen motor vehicles, 41 Stat. 324 (1919), 18
U. S. C. § 408; transportation of kidnapped persons, 47 Stat. 326
(1932), 18 U. S. C. § 408a–408c; threatening communication in inter-
state commerce, 48 Stat. 781 (1934), 18 U. S. C. § 408d; transporta-
tion of stolen or feloniously taken goods, securities or money, 48 Stat.
794 (1934), 18 U. S. C. § 415; transporting strikebreakers, 49 Stat.
1899 (1936), 18 U. S. C. § 407a; destruction or dumping of farm
products received in interstate commerce, 44 Stat. 1355 (1927), 7
U. S. C. § 491. Cf. National Labor Relations Act, 49 Stat. 449
(1935), 29 U. S. C., Ch. 7, § 151, "Findings and Declaration of
Policy. The denial by employers of the right of employees to
organize and the refusal by employers to accept the procedure of
collective bargaining lead to strikes and other forms of industrial
strife and unrest, which have the intent or necessary effect of
burdening or obstructing commerce. . . ."

The Anti-Racketeering Act, 48 Stat. 979, 18 U. S. C. § 420a–e
(1934), is designed to protect trade and commerce against interfer-
ence by violence and threats. Sec. 420a provides that "any person who,
in connection with or in relation to any act in any way or in any
degree affecting trade or commerce or any article or commodity
moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to
use or threat to use force, violence, or coercion, the payment of
money or other valuable considerations . . . not including, however,
the payment of wages by a bona fide employer to a bona fide
employee; or

"(b) Obtains the property of another, with his consent, induced
by wrongful use of force or fear, or under color of official right, or

"(c) Commits or threatens to commit an act of physical violence
or physical injury to a person or property in furtherance of a plan
or purpose to violate subsection (a) or (b);

"(d) Conspires or acts concertedly with any other person or
persons to commit any of the foregoing acts, shall, upon conviction

and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern. The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.[15]

thereof, be guilty of a felony and shall be punished by imprisonment from one to ten years or by fine of $10,000 or both."

But the application of the provisions of § 420a to labor unions is restricted by § 420d, which provides: "Jurisdiction of offenses. Any person charged with violating section 420a of this title may be prosecuted in any district in which any part of the offense has been committed by him or by his actual associates participating with him in the offense or by his fellow conspirators: *Provided,* That no court of the United States shall construe or apply any of the provisions of sections 420a to 420e of this title in such manner as to impair, diminish, or in any manner affect the rights of bona fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States."

It is significant that Chapter 9 of the Criminal Code, dealing with "Offenses against Foreign and Interstate Commerce," and relating specifically to acts of interstate transportation or its obstruction, makes no mention of the Sherman Act, which is made a part of the Code which deals with social, economic and commercial results of interstate activity, notwithstanding its criminal penalty.

[15] The history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that "business competition" was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition.

On July 10, 1888, the Senate adopted without discussion a resolution offered by Senator Sherman which directed the Committee on Finance to inquire into and report in connection with revenue bills, "such measures as it may deem expedient to set aside, control, restrain, or prohibit all arrangements, contracts, agreements, trusts, or combinations between persons or corporations, made with a view, or

For that reason the phrase "restraint of trade" which, as will presently appear, had a well-understood meaning at

which tend to prevent *free and full competition* . . . with such penalties and provisions . . . as will tend to preserve freedom of trade and production, the natural competition of increasing production, the lowering of prices by such competition . . ." (19 Cong. Rec. 6041.)

This resolution explicitly presented the economic theory of the proponents of such legislation. The various bills introduced between 1888 and 1890 follow the theory of this resolution. Many bills sought to make void all arrangements "made with a view, or which tend, to prevent full and free competition in the production, manufacture, or sale of articles of domestic growth or production," S. 3445; S. 3510; H. R. 11339, all of the 50th Cong., 1st Sess. (1888) were bills of this type. In the 51st Cong. (1889) the bills were in a similar vein. See S. 1, § 1 (this bill as redrafted by the Judiciary Committee ultimately became the Sherman Law); H. R. 202, § 3; H. R. 270; H. R. 286; H. R. 402; H. R. 509; H. R. 826; H. R. 3819. See Bills and Debates in Congress relating to Trusts (1909), Vol. 1, pp. 1025–1031.

Only one, which was never enacted, S. 1268 in the 52d Cong., 1st Sess. (1892), introduced by Senator Peffer, sought to prohibit "every wilful act . . . which shall have the effect to in anyway interfere with the freedom of transit of articles in interstate commerce, . . ."

When the antitrust bill (S. 1, 51st Cong., 1st Sess.), came before Congress for debate, the debates point to a similar purpose. Senator Sherman asserted the bill prevented only "business combinations" "made with a view to prevent competition," 21 Cong. Rec. 2457, 2562; see also *ibid*. at 2459, 2461.

Senator Allison spoke of combinations which "control prices," *ibid*. 2471; Senator Pugh of combinations "to limit production" for "the purpose of destroying competition," *ibid*. 2558; Senator Morgan of combinations "that affect the price of commodities," *ibid*. 2609; Senator Platt, a critic of the bill, said this bill proceeds on the assumption that "competition is beneficent to the country," *ibid*. 2729; Senator George denounced trusts which crush out competition "and that is the great evil at which all this legislation ought to be directed," *ibid*. 3147.

In the House, Representative Culberson, who was in charge of the bill, interpreted the bill to prohibit various arrangements which tend to drive out competition, *ibid*. 4089; Representative Wilson spoke in favor of the bill against combinations among "competing producers to control the supply of their product, in order that they may dictate

common law, was made the means of defining the activities prohibited. The addition of the words "or commerce among the several states" was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the prohibited restraint of trade to interstate commerce for constitutional purposes, *Atlantic Cleaners & Dyers* v. *United States*, 286 U. S. 427, 434, so that Congress, through its commerce power, might suppress and penalize restraints on the competitive system which involved or affected interstate commerce. Because many forms of restraint upon commercial competition extended across state lines so as to make regulation by state action difficult or impossible, Congress enacted the Sherman Act, 21 Cong. Rec. 2456. It was in this sense of preventing restraints on commercial competition that Congress exercised "all the power it possessed." *Atlantic Cleaners & Dyers* v. *United States, supra,* 435.

A second significant circumstance is that this Court has never applied the Sherman Act in any case, whether or not involving labor organizations or activities, unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services [16] and finally this Court has refused

---

the terms on which they shall sell in the market, and may secure release from the stress of competition among themselves," *ibid.* 4090.

The unanimity with which foes and supporters of the bill spoke of its aims as the protection of free competition, permit use of the debates in interpreting the purpose of the act. See White, C. J., in *Standard Oil Co.* v. *United States,* 221 U. S. 1, 50; *United States* v. *San Francisco, ante,* p. 16.

See also Report of Committee on Interstate Commerce on Control of Corporations Engaged in Interstate Commerce, S. Rept. 1326, 62d Cong., 3d Sess. (1913), pp. 2, 4; Report of Federal Trade Commission, S. Doc. 226, 70th Cong., 2d Sess. (1929), pp. 343–345.

[16] While it is impossible to consider all the anti-trust cases in this Court with reference to the question whether the acts condemned

*to apply the Sherman Act in cases like the present in which local strikes conducted by illegal means in a*

or condoned had a substantial effect on competition in the industry, nevertheless in most of them, particularly in the cases arising since the development of the "rule of reason" in 1912, emphasis was placed on the "competitive conditions in the industry."

In *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, arising before the "rule of reason," Justice Peckham adopted Judge Taft's statement of the case in his opinion in the Circuit Court of Appeals, pointing out that within substantial parts of the United States, price competition had been practically eliminated (see page 236). *Standard Oil Co.* v. *United States,* 221 U. S. 1, which heralded the "rule of reason" stressed intent to eliminate competition and the predatory practices by which competition had actually been eliminated. *United States* v. *American Tobacco Co.,* 221 U. S. 106, decided the same day, involved a trust which dominated the whole industry and exercised its power in securing price control. In both the *Oil* case and the *Tobacco* case, decisions were specifically rested on the ground that the condemned combinations "unduly restricted competition."

A combination of two great railroads resulting in "destroying or greatly abridging the free operation of competition theretofore existing" was enjoined in *United States* v. *Union Pacific Co.,* 226 U. S. 61. But where the majority of the Court was of opinion that the evidence did not show that the combination "ever possessed or exerted sufficient power when acting alone to control prices of the products of the industry," the Sherman Act was held not to apply to the combination, *United States* v. *United States Steel Corp.,* 251 U. S. 417. On finding such a power to control the output, supply of the market and the transportation facilities of potential competitors, in the anthracite coal market, the arrangement was held void in *United States* v. *Reading Co.,* 253 U. S. 26, 47–48.

The belief that "competitive conditions in the trade in harvesting machines have been established," compelled the court to find compliance with an earlier consent decree in *United States* v. *International Harvester Co.,* 274 U. S. 693, 704.

"It has been repeatedly held by this Court that the purpose of the statute is to maintain free competition in interstate commerce . . ," *American Column & Lumber Co.* v. *United States,* 257 U. S. 377, 400; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61, 87; *United States* v. *Reading Co.,* 226 U. S. 324, 369; *Eastern States*

production industry prevented interstate shipment of substantial amounts of the product but in which it was not shown that the restrictions on shipments had operated to restrain commercial competition in some substantial way. *First Coronado* case, *supra; Leather Workers* case, *supra. Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103.

The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman law.[17]   They were contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market.   Such contracts were deemed illegal and were unenforcible at common law.   But the resulting restraints of trade were not penalized and gave rise to no actionable wrong.   Certain classes of restraints were not outlawed when deemed reasonable, usually because they served to preserve or protect legitimate interests, previously existing, of one or more parties to the contract.[18]

In seeking more effective protection of the public from the growing evils of restraints on the competitive system

*Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, 609; *United States* v. *Trenton Potteries,* 273 U. S. 392, 397; *Appalachian Coals* v. *United States,* 288 U. S. 344, 360.

For a complete collection of cases, see Handler, Industrial Mergers and the Anti-Trust Laws, 32 Columbia Law Rev. 179; Handler, The Sugar Institute Case, 36 Columbia Law Rev. 1; The Rule of Reason in Loose-Knit Combinations, 32 Columbia Law Rev. 291.

[17] In his explanation of the bill Senator Sherman referred to several common law cases on restraint of trade.  21 Cong. Rec. 2457–2460.

[18] *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271.  See cases collected in Handler, Cases on Trade Regulations (1937), cc. III, IV; Handler, Restraint of Trade, 13 Ency. Soc. Sciences, 339.

effected by the concentrated commercial power of "trusts" and "combinations" at the close of the nineteenth century, the legislators found ready at their hand the common law concept of illegal restraints of trade or commerce. In enacting the Sherman law they took over that concept by condemning such restraints wherever they occur in or affect commerce between the states. They extended the condemnation of the statute to restraints effected by any combination in the form of trust or otherwise, or conspiracy, as well as by contract or agreement, having those effects on the competitive system and on purchasers and consumers of goods or services which were characteristic of restraints deemed illegal at common law, and they gave both private and public remedies for the injuries flowing from such restraints.

That such is the scope and effect of the Sherman Act was first judicially recognized and expounded in the classic opinion in *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, affirmed 175 U. S. 211, written by Judge, later Chief Justice, Taft, and concurred in by Justice Harlan and Judge, later Justice, Lurton, of this Court. This Court has since repeatedly recognized that the restraints at which the Sherman law is aimed, and which are described by its terms, are only those which are comparable to restraints deemed illegal at common law, although accomplished by means other than contract and which, for constitutional reasons, are confined to transactions in or which affect interstate commerce.[19]

---

[19] See cases discussed in note 15, *supra.* See also, *United States* v. *Freight Association,* 166 U. S. 290; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505; *Montague & Co.* v. *Lowry,* 193 U. S. 38; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 361; *Nash* v. *United States,* 229 U. S. 373, 376; *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238; *Maple Flooring Assn.* v. *United States,* 268 U. S. 563, 583, 584.

In *Standard Oil Co.* v. *United States,* 221 U. S. 1, 54, 55, 58, decided in 1911, this Court, speaking through Chief Justice White, pointed out that the restraint of trade contemplated by § 1 of the Act took its origin from the common law, and that the Sherman Act was adapted to the prevention, in modern conditions, of conduct or dealing effecting the wrong, at which the common law doctrine was aimed. This, it was said, is "the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations, . . ." [20] The Court declared, page 59, that "the statute was drawn in the light of the existing practical conception of the law of restraint of trade," and drew the conclusion that the restraints which were condemned by the statute are those which, following the common law analogy, are "unreasonable or undue." This view was followed and more explicitly stated in *United States* v. *American Tobacco Co.,* 221 U. S. 106,

---

[20] "Without going into detail and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations, led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy." *Standard Oil Co.* v. *United States,* 221 U. S. 1, at 58.

179, where it was said: ". . . it was held in the *Standard Oil* case that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance." In thus grounding the "rule of reason" upon the analogy of the common law doctrines applicable to illegal restraints of trade the Court gave a content and meaning to the statute in harmony with its history and plainly indicated by its legislative purpose. Labor cases apart, which will presently be discussed, this Court has not departed from the conception of the Sherman Act as affording a remedy, public and private, for the public wrongs which flow from restraints of trade in the common law sense of restriction or suppression of commercial competition. In the cases considered by this Court since the *Standard Oil* case in 1911 some form of restraint of commercial competition has been the *sine qua non* to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price.[21] It is in this sense that it is said that the restraints, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate com-

---

[21] See e. g. *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436; *United States* v. *Socony-Vacuum Oil Co., ante*, p. 150, especially note 59 and cases cited.

merce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition. *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238; *United States* v. *United States Steel Co.,* 251 U. S. 417; *Cement Manufacturers Assn.* v. *United States,* 268 U. S. 588; *United States* v. *International Harvester Co.,* 274 U. S. 693; *Appalachian Coals* v. *United States,* 288 U. S. 344, 375, *et seq.*[22]

The question remains whether the effect of the combination or conspiracy among respondents was a restraint of trade within the meaning of the Sherman Act. This is not a case of a labor organization being used by combinations of those engaged in an industry as the means or instrument for suppressing competition or fixing prices. See *United States* v. *Brims,* 272 U. S. 549; *Local 167* v. *United States,* 291 U. S. 293. Here it is plain that the combination or conspiracy did not have as its purpose restraint upon competition in the market for petitioner's product. Its object was to compel petitioner to accede to the union demands and an effect of it, in consequence of the strikers' tortious acts, was the prevention of the removal of petitioner's product for interstate shipment. So far as appears the delay of these shipments was not intended to have and had no effect on prices of hosiery in the market, and so was in that respect no more a restraint forbidden by the Sherman Act than the restriction upon competition and the course of trade held lawful in *Appalachian Coals* v. *United States, supra,* because notwithstanding its effect upon the marketing of the coal

_____

[22] ". . . 'only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.'" *Appalachian Coals* v. *United States,* 288 U. S. 344, 360.

it nevertheless was not intended to and did not affect market price.

A combination of employees necessarily restrains competition among themselves in the sale of their services to the employer; yet such a combination was not considered an illegal restraint of trade at common law when the Sherman Act was adopted, either because it was not thought to be unreasonable or because it was not deemed a "restraint of trade." [23]    Since the enactment of the

---

[23] Combinations of capital and labor have seldom been treated as phases of a general movement to suppress competition. See Taft, Anti-Trust Act and the Supreme Court (1914), p. 21; Seager, The Attitude of the State Towards Trade Unions and Trusts, 22 Pol. Sci. Q. 385 (1907); Commons and Andrews, Principles of Labor Legislation (1927), pp. 125–129.

In England prior to 1824 the two types of combinations were treated as substantially the same, the Combinations Acts (39 Geo. III, c. 81; 39 & 40 Geo. III, c. 106), preventing combinations of wage earners even for the more obvious purpose of securing higher wages or shorter hours. These restrictions have been removed by various Acts (e. g. 5 Geo. IV, c. 95, s. 2; 22 Vict., c. 34; 34 & 35 Vict., c. 31, s. c.; 38 & 39 Vict. 36) until the Trade Disputes Act of 1906 (6 Edw. VII, c. 47) which clearly encourages the combinations of workmen. See Henderson, Trade Unions and the Law (1927). Compare the English treatment of capital combirations, see, The Anti-Trust Laws of the British Commonwealth of Nations, 32 Col. L. Rev. 324.

The experience in the United States has paralleled that in England. In a few early cases all labor combinations were regarded as unlawful, Groat, Attitude of American Courts in Labor Cases, 42 Col. Univ. Studies (1911), pp. 36–38, but since *Commonwealth v. Hunt,* 4 Metcalf 111 (Mass. 1842), the legitimate scope of labor combinations has steadily expanded, see Frankfurter and Greene, The Labor Injunction (1930), c. I; Landis, Cases on Labor Law (1934), pp. 32–34. In addition to this difference in treatment reflected in judicial decisions, many states have by legislation accorded favorable treatment to unions on other matters. See collection of legislation favorable to unionism found in *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344, 386, note 1; Bull. No. 370, Labor Laws of

declaration in § 6 of the Clayton Act that "the labor of a human being is not a commodity or article of commerce . . . nor shall such [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in the restraint of trade under the antitrust laws," it would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act.

Strikes or agreements not to work, entered into by laborers to compel employers to yield to their demands, may restrict to some extent the power of employers who are parties to the dispute to compete in the market with those not subject to such demands. But under the doctrine applied to non-labor cases, the mere fact of such restrictions on competition does not in itself bring the parties to the agreement within the condemnation of the Sherman Act. *Appalachian Coals* v. *United States, supra,* 360. Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, see *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209, an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been

---

the United States, Bureau of Labor Statistics, United States Department of Labor (1925); Witte, The Government and Labor Disputes (1932), 17 *et seq.*

considered to be the kind of curtailment of price competition prohibited by the Sherman Act. See *Levering & Garrigues Co.* v. *Morrin, supra;* cf. *American Foundries case, supra,* 209; *National Association of Window Glass Mfrs.* v. *United States,* 263 U. S. 403.[24] And in any case, the restraint here is, as we have seen, of a different kind and has not been shown to have any actual or intended effect on price or price competition.

---

[21] Federal legislation aimed at protecting and favoring labor organizations and eliminating the competition of employers and employees based on labor conditions regarded as substandard, through the establishment of industry-wide standards both by collective bargaining and by legislation setting up minimum wage and hour standards, supports the conclusion that Congress does not regard the effects upon competition from such combinations and standards as against public policy or condemned by the Sherman Act.

The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–115, limiting the use of injunctions in labor disputes, is predicated on the policy that "under prevailing economic conditions," it is necessary that the worker "have full freedom of association . . . to negotiate the terms and conditions of his employment." The Railway Labor Act of 1934, 48 Stat. 1185, 45 U. S. C. §§ 151–164, provided for independence of railroad employees in the matter of self-organization. The National Labor Relations Act, 49 Stat. 449, 29 U. S. C. §§ 151–166, was passed to protect the workers in the "exercise of full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating the terms and conditions of their employment . . ." and expressly protects the right of self-organization, recognizes the strike as a proper union weapon and permits closed-shop contracts.

The Public Contracts Act, 49 Stat. 2036, 41 U. S. C. §§ 35–48, was aimed at preventing price competition in government bidding based on wage cutting and authorizes the establishment of minimum wage standards. The Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. §§ 201–219, likewise seeks to eliminate competition which thrived upon low wages and substandard working conditions.

This series of acts clearly recognizes that combinations of workers eliminating competition among themselves and restricting competition among their employers based on wage cutting are not contrary to the public policy.

This Court first applied the Sherman Act to a labor organization in *Loewe* v. *Lawlor*, 208 U. S. 274, in 1908, holding that the trial court had erroneously sustained a demurrer to the declaration in a suit for damages for violation of the Sherman Act on the ground that the combination alleged was not within the Act. The combination or conspiracy charged was that of a nation-wide labor organization to force all manufacturers of fur hats in the United States to organize their workers by maintaining a boycott against the purchase of the product of non-union manufacturers shipped in interstate commerce. The restraint alleged was not a strike or refusal to work in the complainants' plant, but a secondary boycott by which, through threats to the manufacturer's wholesale customers and their customers, the Union sought to compel or induce them not to deal in the product of the complainants, and to purchase the competing products of other unionized manufacturers. This Court pointed out that the restraint was precisely like that in *Eastern States Retail Lumber Dealers Co.* v. *United States,* 234 U. S. 600, 610, 614, in which a conspiracy to circulate a "black list," intended to persuade retailers not to deal with specified wholesalers, was held to violate the Act because of its restraint upon competition with unlisted wholesalers. The Court in the *Loewe* case held that the boycott operated as a restraint of trade or commerce within the meaning of the Sherman Act, and that the language of the Act, "every combination, etc." was broad enough to include a labor union imposing such a restraint. Like problems found a like solution in *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, and in *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters Assn.,* 274 U. S. 37; where, in the one case, a secondary boycott, and in the other, the refusal of the union to work on a product in the hands of the purchaser, were carried on on a country-wide scale by a national labor organization, in order to

induce the purchasers of a manufactured product shipped in interstate commerce to withdraw their patronage from the producer. In both, as in the *Loewe* case, the effort of the union was to compel unionization of an employer's factory, not by a strike in his factory but by restraining, by the boycott or refusal to work on the manufactured product, purchases of his product in interstate commerce in competition with the like product of union shops.

In the *Bedford Stone* case it was pointed out that, as in the *Duplex Printing Press Co.* case, the strike was directed against the use of the manufactured product by consumers "with the immediate purpose and effect of restraining future sales and shipments in interstate commerce" and "with the plain design of suppressing or narrowing the interstate market," and that in this respect the case differed from those in which a factory strike, directed at the prevention of production with consequent cessation of interstate shipments, had been held not to be a violation of the Sherman law. See *First Coronado* case, *supra; Leather Workers* case, *supra; cf. Second Coronado* case, *supra,* 310.

It will be observed that in each of these cases where the Act was held applicable to labor unions, the activities affecting interstate commerce were directed at control of the market and were so widespread as substantially to affect it. There was thus a suppression of competition in the market by methods which were deemed analogous to those found to be violations in the non-labor cases. See *Montague & Co.* v. *Lowry,* 193 U. S. 38, 45, 46; *Retail Lumber Dealers Co.* v. *United States, supra; Paramount Famous Lasky Co.* v. *United States,* 282 U. S. 30; *United States* v. *First National Pictures,* 282 U. S. 44. That the objective of the restraint in the boycott cases was the strengthening of the bargaining position of the union and not the elimination of business competition—which was the end in the non-labor cases—was

thought to be immaterial because the Court viewed the restraint itself, in contrast to the interference with shipments caused by a local factory strike, to be of a kind regarded as offensive at common law because of its effect in curtailing a free market and it was held to offend against the Sherman Act because it effected and was aimed at suppression of competition with union made goods in the interstate market.

Both the *Duplex Printing Co.* and *Bedford Stone* cases followed the enactment of the Clayton Act and the recognition of the "rule of reason" in the *Standard Oil* case, *supra.* The applicability of that rule to restraints upon commerce affected by a labor union in order to promote and consolidate the interests of its union was not considered.[25] But an important point considered and decided by the Court in both cases was that nothing in the Clayton Act precluded the relief granted. We are not now concerned with the merits of either point.[26] The only

---

[25] Whether the interest of the labor unions in these cases in maintaining and extending their respective organizations, rendered the restraint reasonable as a means of attaining that end within the common law rule, or brought the restraints within the rule of reason developed and announced in the Standard Oil case, was not discussed and we need not consider it here. Restraints upon the competitive marketing of a manufacturer's product brought about by an agreement between the employer and his employees in order to secure continuous employment of the employees was held to be within the rule of reason and therefore not an unreasonable restraint of trade in *National Association of Window Glass Mfrs.* v. *United States,* 263 U. S. 403.

[26] Section 6 of the Clayton Act declared that "nothing contained in the anti-trust laws shall be construed . . . to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws." And § 20 of the Clayton Act provided, "No restraining order or injunction shall be granted by any court of the United States, or a judge or

significance of the two cases for present purposes is that in each the Court considered it necessary, in order to support its decision, to find that the restraint operated to suppress competition in the market.

This Court was first called on to consider a case like the present in the *First Coronado* case, *supra*. There a local branch of a national labor union sought to unionize a coal mine which was shipping its product interstate to the extent of more than 5,000 tons a week. Members of the union compelled the mine to shut down, by force and violence, including murder and arson. By reason of their forcible action all work at the mine was prevented, it filled with water, shipments of coal which were regularly moving in interstate commerce as mined, ceased, and

the judges thereof, in any case between an employer and employees, or between employers and employees . . . involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right. . . .

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; . . . or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; . . . nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

In both the *Duplex Printing Press Co.* and the *Bedford Stone Cutters* cases, it was held that the prohibition of § 6 of the Clayton Act did not extend to illegal combinations or conspiracies in restraint of trade, which the concerted action taken by the labor unions in these cases was held to be, and that the restrictions of § 20 of the Clayton Act upon the injunction applied only to actual disputes between an employer and his employees, with respect to the terms or conditions of their own employment, and did not extend to acts of labor unions, boycotting the product of an employer by whom they were not employed. Cf. *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552.

the strikers burned more than ten cars, three of them loaded with coal and some billed for movement interstate. This Court, notwithstanding the admittedly substantial effect of the strike on the interstate movement of the coal, and the admittedly illegal and outrageous acts of the strikers, held that it was not a restraint of trade or commerce prohibited by the Sherman Act. It rested its decision specifically on two grounds: that "obstruction to coal mining is not a direct obstruction to interstate commerce in coal," [27] and that the intent to obstruct the mining of coal and to burn the loaded cars, did not necessarily imply an intent to restrain the commerce, although concededly interstate shipments and the filling of interstate orders for coal were necessarily ended by the stoppage of mining operations and the destruction of the loaded cars. It perhaps suffices for present purposes to say that if the strike in the *Coronado* case was not within the Sherman Act because its effect upon the commerce was "indirect" and because the "intention" to shut down the mine and destroy the cars of coal destined for an interstate shipment, did not imply an "intention to obstruct interstate commerce," then the like tests require the like decision here.

But we are not relegated to so mechanical an application of these cryptic phrases in the application of the Sherman Anti-Trust Act, for the Court has since so in-

---

[27] The assertion that the decision in the *First Coronado* case rests on the ground that "production, as such—in that case, coal mining—was not interstate commerce" is neither supported by the opinion in that case nor by its subsequent interpretation by this Court. See *Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 548; *Labor Board* v. *Jones & Laughlin Co.*, 301 U. S. 1, 40. See note 9, *supra*. Cf. *Sunshine Anthracite Coal Co.* v. *Adkins, ante,* p. 381. The opinion recognized that the cessation of production of the coal prevented interstate commerce in the coal but held that it did not violate the Sherman Act because the effect on the commerce was "indirect," to which it was thought the Sherman Act did not apply.

terpreted them as to give to the phrase "restraint of trade or commerce" a meaning and content consonant with the legislative and judicial history of the Act to which we have referred. In the *Leather Workers* case, *supra,* the Court was again called on to determine whether a local strike in a factory which prevented shipment of its product in filling interstate orders of substantial volume violated the Sherman Act. As in the *First Coronado* case the Court held that the restraint was not one prohibited by the Sherman Act. It pointed out, page 469, that there has been no attempt, as in *Loewe* v. *Lawlor,* to boycott the sale of complainant's products in other states, and that if the interruption of interstate shipments resulting from a local factory strike aimed at compelling the employer to yield to union demands were deemed within the sweep of the Sherman Act, "The natural, logical and inevitable result will be that every strike in any industry or even in any single factory will be within the Sherman Act and subject to federal jurisdiction provided any appreciable amount of its product enters into interstate commerce," page 471. After discussing the cases which had given currency to the notion that the Sherman Act, where the combination or conspiracy is not formed with the "intent to restrain trade or commerce," is to be applied only to those restraints characterized as "direct," the Court said, page 471:

"This review of the cases makes it clear that the mere reduction in the supply of an article to be shipped in interstate commerce, by the illegal or tortious prevention of its manufacture, is ordinarily an indirect and remote obstruction to that commerce. It is only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize the supply, control its price or discriminate as between its would-be purchasers, that the unlawful interference

with its manufacture can be said directly to burden interstate commerce."

And the Court added,

"The record is entirely without evidence or circumstances to show that the defendants in their conspiracy to deprive the complainants of their workers were thus directing their scheme against interstate commerce."

It was thus made apparent that in saying that "indirect obstructions" to commerce were not condemned by the Sherman Act where the conspiracy is not directed at that commerce, the Court was not seeking to apply a purely mechanical test of liability, but was using a shorthand expression to signify that the Sherman Act was directed only at those restraints whose evil consequences are derived from the suppression of competition in the interstate market, so as "to monopolize the supply, control its price or discriminate between its would-be purchasers." And in speaking of intent as a prerequisite to liability under the Act where the restraint to interstate commerce is "indirect" it meant no more than that the conspiracy or combination must be aimed or directed at the kind of restraint which the Act prohibits or that such restraint is the natural and probable consequences of the conspiracy.

This was again pointed out in the *Second Coronado* case, *supra,* 310, where upon a retrial of the case on amended pleadings it appeared that "the purpose of the destruction of the mines was to stop the production of non-union coal and prevent its shipment to markets of other states than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines, . . ." The Court declared such a restraint to be a "direct violation of the Sherman Act." The like distinction was taken and explanation made in the *Bedford Stone*

case, *supra,* pp. 46, 49, where the restraint consisted in the refusal of the unions to work on stone shipped interstate from an open shop quarry after its interstate journey to the purchaser had ended, and where it appeared that the purpose of the strike was to prevent the interstate sale of the stone in competition with the product of unionized producers. Cf. *Levering & Garrigues Co.* v. *Morrin, supra.*

These cases show that activities of labor organizations not immunized by the Clayton Act are not necessarily violations of the Sherman Act. Underlying and implicit in all of them is recognition that the Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to "monopolize the supply, control its price, or discriminate between its would-be purchasers." These elements of restraint of trade, found to be present in the *Second Coronado* case and alone to distinguish it from the *First Coronado* case and the *Leather Workers* case, are wholly lacking here. We do not hold that conspiracies to obstruct or prevent transportation in interstate commerce can in no circumstances be violations of the Sherman Act. Apart from the Clayton Act it makes no distinction between labor and non-labor cases. We only hold now, as we have previously held both in labor and non-labor cases, that such restraints are not within the Sherman Act unless they are intended to have, or in fact have, the effects on the market on which the Court relied to establish violation in the *Second Coronado* case. Unless the principle of these cases is now to be discarded, an impartial application of the Sherman Act to the activities of industry and labor alike would seem to require that the Act be held inapplicable to the activities of respondents which had an even less substantial effect

on the competitive conditions in the industry than the combination of producers upheld in the *Appalachian Coals* case and in others on which it relied.[28]

If, without such effects on the market, we were to hold that a local factory strike, stopping production and shipment of its product interstate, violates the Sherman law, practically every strike in modern industry would be brought within the jurisdiction of the federal courts, under the Sherman Act, to remedy local law violations. The Act was plainly not intended to reach such a result, its language does not require it, and the course of our decisions precludes it. The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb the balance is not lightly to be imputed to Congress. The Sherman Act is concerned with the character of the prohibited restraints and with their effect on interstate commerce. It draws no distinction between the restraints effected by violence and those achieved by peaceful but oftentimes quite as effective means. Restraints not within the Act, when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence.

*Affirmed.*

---

[28] It is said to be anomalous to hold employers subject to the Labor Act because their unfair practices would prevent the shipment of their goods in interstate commerce, and at the same time to hold the activities of employees which amount to a "direct and intentional obstruction" to interstate movement of goods, not to be within the meaning of "restraint of trade or commerce," under the Sherman Act. If any other answer than a comparison of the legislative history and objectives of the two acts, and our decisions under them, were needed, it seems obvious that the Sherman Act cannot be said to subject employees to a liability which it does not impose on employers or others.    [Over.]

MR. CHIEF JUSTICE HUGHES, dissenting:

The undisputed facts will bear a brief repetition, for upon an appreciation of their true import hinges the application of the Sherman Act.

As the Circuit Court of Appeals said, the evidence disclosed a "sit-down strike in its most aggravated and illegal form." When the Union demanded a closed shop agreement and, on its refusal, declared the strike, only eight of the Company's twenty-five hundred employees were members of the Union. The Company's plant was seized and held for several weeks. Its machinery and equipment were "wantonly demolished or damaged to the extent of many thousands of dollars."

There was not merely a stoppage of production, but there was also a deliberate prevention of the shipment of finished goods to customers outside the State. This was not simply the result of the occupation of the plant but was due to the repeated and explicit refusals of the Union to permit the shipment. These goods amounted to 134,000 dozens of finished hosiery, of the value of about $800,000, of which 80 per cent, as respondents well know, were ready for shipment in interstate commerce. The evidence is that the Company's representative thus besought the Union's president: "We have orders on hand from customers all over the country which we can fill with merchandise which we have on hand at the plant. Will you permit us to go into the plant for the sole purpose of removing that finished merchandise so that we can ship it against orders?" The Union's president emphatically answered: "No, not until this strike is settled."

There was thus a direct and intentional prevention of interstate commerce in the furtherance of an illegal conspiracy. This, I take it, the opinion of the Court concedes. Whatever vistas of new uncertainties in the application of the Sherman Act the present decision may open,

it seems to be definitely determined that a conspiracy of workers, or for that matter of others, to obstruct or prevent the shipment or delivery of goods in interstate commerce to fill orders of the customers of a manufacturer or dealer is not a violation of the Sherman Act. With that conclusion I cannot agree.

The argument has been pressed in this case, and in other recent cases, that the Sherman Act does not apply to labor unions. The Court finds that argument untenable, referring to our decisions to the contrary and to the failure of repeated attempts to persuade Congress to exclude labor organizations from the operation of the Act. Respondents' argument for immunity under the terms of §§ 6 and 20 of the Clayton Act[1] has also been found unavailing. Section 6 declares that "the labor of a human being is not a commodity or article of commerce" and that nothing in the anti-trust laws shall be construed to forbid the existence and operation of labor organizations instituted for the purpose of mutual help, "or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws." The reference in the last clause to "*such* organizations" has manifest reference to what precedes, and the immunity conferred is only with respect to the "lawfully carrying out" of their "legitimate objects." Section 20 forbids the granting of injunctions prohibiting persons "singly or in concert" from "terminating any relation of employment," or from engaging in described activities of persuasion, etc., when these are "peaceful and lawful"; or "from peaceably assembling in a lawful manner, and

[1] 15 U. S. C. 17; 29 U. S. C. 52.

for lawful purposes." The inapplicability of these provisions is apparent.

But while the Clayton Act does not give the immunity desired by respondents, and labor unions are found by the Court to be within the purview of the Sherman Act "to some extent and in some circumstances," the Act is construed as not embracing the direct and deliberate interference with interstate commerce that is here disclosed. I think that this construction of the statute is too narrow.

Section one of the Sherman Act[2] condemns as illegal every "combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." "Conspiracy" is a familiar term of art and means a combination of two or more persons by concerted action to accomplish an unlawful purpose, or some purpose not in itself unlawful by unlawful means. There was plainly a conspiracy here. To "restrain" is to hold back, repress, obstruct,—to hinder from liberty of action. Manifestly there was restraint in this case. What then is the significance of the term "commerce" as used in the Act? Adopting the language of the Constitution, Congress evidently used the term in its constitutional sense. "Commerce" is intercourse; in its most limited meaning it embraces traffic. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189. "Commerce" manifestly covers the shipment and transportation of commodities across state lines to execute contracts of sale. The term "commerce," we said in *Second Employers' Liability Cases,* 223 U. S. 1, 46, "embraces commercial intercourse in all its branches, including transportation of passengers and property by common carriers whether carried on by water or by land."

[2] 15 U. S. C. 1.

As the instant case falls directly within the language of the Sherman Act in its natural import, the question is whether that language has been, or should be, so narrowed by judicial construction as to exclude from its application the conspiracy and restraint here found. The scope of this question is not only limited by the conclusion of the Court that labor unions are not excepted from the Act but also by the Court's rejection of the bases of the decision of the court below. Thus the immediacy of the effect of respondents' action upon interstate commerce is admitted, and the argument that the interdicted shipments constituted but a small part of the "total national output in the industry" is dismissed as irrelevant. This ruling necessarily follows from the reasoning of our decisions under the National Labor Relations Act. In *Labor Board* v. *Fainblatt,* 306 U. S. 601, 606, we said that "The exercise of Congressional power under the Sherman Act . . . has never been thought to be constitutionally restricted because in any particular case the volume of the commerce affected may be small." Here, the volume affected was very substantial although it was but a small proportion of the entire traffic in similar commodities. Again, the Court rejects the conclusion of the court below that the evidence did not sustain a finding that respondents intended to prevent the shipment of the goods. The contrary, as we have seen, was clearly shown.

Nor does the "rule of reason" aid respondents.[3] The test of reasonableness under that rule is the effect of the agreement or combination, not the motives which inspire it. Leaders of industry have been taught in striking fashion that when the Court finds that they have combined to impose a direct restraint upon interstate com-

---

[3] *Standard Oil Co.* v. *United States,* 221 U S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106.

merce, their benevolent purposes to promote the interest of the industry, or to rescue it from a distressful condition, will not save them even from criminal prosecution for violation of the Sherman Act.  See *United States* v. *Socony-Vacuum Oil Co., ante,* p. 150.  If labor unions are not excepted from the Act, and they have acted outside the legitimate field contemplated by the Clayton Act, the impartial enforcement of the law would seem to require that the same doctrine be applied to them.  In that view, the purpose of respondents to promote the interests of labor organization cannot be deemed to justify the direct and intentional restraint they imposed upon interstate commerce.  The opinion of the Court does not appear to hold otherwise.  From no point of view, as it seems to me, can the restraint be regarded as reasonable.

Why then should the Sherman Act be construed to be inapplicable?  It is said that the Act was not aimed at "policing" interstate transportation.  But this would seem to be a statement of result rather than a justification for reaching it.  If "policing" means the protection of interstate transportation from unlawful conspiracies to restrain it, it would seem that the Sherman Act provides that protection.  The fact that various statutes have been passed by Congress to prevent the transportation of articles deemed to be injurious does not indicate the contrary, for these are statutes restricting the right of transportation in order to protect the public, while the Sherman Act is aimed at securing the freedom of transportation in lawful commerce.

The question whether a conspiracy to prevent transportation in interstate commerce was within the Sherman Act came before the circuit courts not long after the Act was passed.  In *United States* v. *Workingmen's Amalgamated Council,* 54 F. 994, it appeared that in consequence of a difference between the warehousemen in New Orleans and their employees and the principal draymen and

their subordinates, a strike was called by labor associations which enforced "a discontinuance of labor in all kinds of business, including the business of transportation of goods and merchandise which were in transit through the City of New Orleans, from state to state, and to and from foreign countries." By the intended effect of the defendants' actions, "not a bale of goods constituting the commerce of the country could be moved." District Judge Billings, sitting in the Circuit Court, concluded that there was no question "but that the combination of the defendants was in restraint of commerce" and hence a violation of the Sherman Act. *Id.,* pp. 999, 1000. An injunction was granted and the order was affirmed by the Circuit Court of Appeals. 57 F. 85.

A similar view was apparently entertained by Circuit Judge Taft and Circuit Judge Lurton. See *Thomas* v. *Cincinnati, N. O. & T. P. Ry. Co.,* 62 F. 803, 821. It was noted in that case that a conspiracy to prevent transportation might result in the paralysis of interstate commerce. *Id.,* p. 822.

In the case of *United States* v. *Debs,* 64 F. 724, the United States brought suit to enjoin those engaged in a conspiracy to interfere with transportation upon several railroads, and an injunction having been issued and disobeyed, contempt proceedings were instituted. The question was whether the federal court had jurisdiction to issue the injunction. Circuit Judge Woods found that it had and based his decision upon the Sherman Act. After stating that the original design of the Act to suppress trusts and monopolies created by contract or combination in the form of trust, which would be of a contractual character, was adhered to, the court thought it equally clear that "a further and more comprehensive purpose" came to be entertained and was embodied in the final form of the enactment. The Act extended to conspiracies in the sense of the law and, citing the decisions showing the

constitutional scope of the term "commerce" and its application to transportation, the court found no reason for thinking that the term as used in the Sherman Act was "less comprehensive." *Id.*, pp. 747–751.

It is true that when the *Debs* case came to this Court on a petition for *habeas corpus*, the decision sustaining the jurisdiction of the federal court to entertain the suit by the United States was placed upon the ground that the United States, having the full attributes of sovereignty within the limits of its granted powers, had among those the power over interstate commerce and over the transmission of the mails and was entitled to remove everything put upon highways, natural or artificial, to obstruct the passage of interstate commerce or the carrying of the mails. 158 U. S. 564. But while the Court chose that broad ground for sustaining jurisdiction, it was careful not to intimate disagreement with the basis of the decision in the Circuit Court as to the application of the Sherman Act. Referring to that decision, and to the Sherman Act, the Court said: "We enter into no examination of the act of July 2, 1890, c. 647, 26 Stat. 209, upon which the Circuit Court relied mainly to sustain its jurisdiction. It must not be understood from this that we dissent from the conclusions of that court in reference to the scope of the act, but simply that we prefer to rest our judgment on the broader ground which has been discussed in this opinion, believing it of importance that the principles underlying it should be fully stated and affirmed." *Id.*, p. 600.

In *Loewe* v. *Lawlor*, 208 U. S. 274, in holding that the Sherman Act applied to labor unions, the Court cited in support of its reasoning the case of *United States* v. *Workingmen's Amalgamated Council, supra,* quoting the statement of District Judge Billings in describing the New Orleans conspiracy: "One of the intended results of their combined action was the forced stagnation of

all the commerce which flowed through New Orleans. This intent and combined action are none the less unlawful because they included in their scope the paralysis of all other business within the city as well." That "forced stagnation" was the obstruction of interstate transportation. The Court in the *Loewe* case also quoted in full the observation in the *Debs* case that the Court should not be understood as dissenting from the conclusions of the circuit court as to the scope of the Sherman Act. And this Court, still considering the application of that Act to labor unions, then quoted what had been said by Mr. Justice Brewer in the *Debs* case (*supra,* p. 581) with respect to obstructions to interstate commerce, as follows: "It is curious to note the fact that in a large proportion of the cases in respect to interstate commerce brought to this court the question presented was of the validity of state legislation in its bearings upon interstate commerce, and the uniform course of decision has been to declare that it is not within the competency of a State to legislate in such a manner as to obstruct interstate commerce. If a State, with its recognized powers of sovereignty, is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that State has a power which the State itself does not possess?" *Loewe* v. *Lawlor, supra,* pp. 303, 304.

In the light of these decisions of the circuit courts and of the significant and unanimous expressions by this Court, the argument seems to be untenable that the Sherman Act has been regarded as not extending to conspiracies to obstruct or prevent transportation in interstate or foreign commerce. On the contrary, I think that hitherto it has not been supposed that such conspiracies lay outside the Act.

With this background we come to the question whether the application of the Sherman Act in the instant case,

522

which would otherwise appear to be required by its comprehensive terms, has been precluded by our decisions in labor cases. The view is announced that the Sherman Act was not directed at those restraints which fall short of any form of market control of a commodity, such as to monopolize the supply, control its price, or discriminate between its would-be purchasers. That is, in short, that it does not apply to the direct and intentional obstruction or prevention of the shipment or transportation of goods to fill the orders of customers in interstate commerce such as we have here. I do not read our decisions as either requiring or justifying such a judicial limitation of the provisions of the Act. Rather, I believe, they point to a contrary conclusion.

While *Loewe* v. *Lawlor, supra,* was the case of a boycott, the principle applied was not limited to that sort of restraint but was as broad as the terms of the Act. The Court not only did not exclude obstruction of interstate shipments from being regarded as a violation of the statute but drew upon the decisions which had involved such obstruction to support its general conclusion. The Court considered the means employed in the *Loewe* case as constituting a direct restraint, but plainly those means were not deemed to be exclusive of other means including those which had been employed in the cases which the Court cited. The same may be said of other boycott cases. See *Duplex Printing Co.* v. *Deering,* 254 U. S. 443; *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters Assn.,* 274 U. S. 37.

In *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 438, the Court, referring to *Loewe* v. *Lawlor,* emphasized the comprehensiveness of the Sherman Act, saying:

"In *Loewe* v. *Lawlor,* 208 U. S. 274, the statute was held to apply to any unlawful combination resulting in restraint of interstate commerce. In that case the damages sued for were occasioned by acts which, among other

things, did include the circulation of advertisements. But the principle announced by the court was general. It covered any illegal means by which interstate commerce is restrained, whether by unlawful combinations of capital, or unlawful combinations of labor; and we think also whether the restraint be occasioned by unlawful contracts, trusts, pooling arrangements, blacklists, boycotts, coercion, threats, intimidation, and whether these be made effective, in whole or in part, by acts, words or printed matter."

Moreover, of what avail is it to interdict boycotts or to assure a free market, that is, to secure freedom in obtaining customers, and yet to leave unprotected the right to ship goods to the customers who are thus obtained? Of what advantage is it to solicit orders freely in interstate commerce if they cannot be filled? The freedom of interstate movement—immunity from conspiracies directly to restrain shipment and delivery—lies at the very base of a free market and the untrammeled making of sales.

The *First Coronado Company* case (259 U. S. 344), chiefly relied upon, does not seem to afford an adequate basis for the broader ruling now made. That decision was centered upon the point that production, as such,— in that case, coal mining,—was not interstate commerce, and that obstruction to coal mining through a strike was not in itself a direct obstruction to interstate commerce. *Id.*, pp. 407, 408. And it was deemed to be necessary to go further and find an "intent to injure, obstruct or restrain interstate commerce" in order to bring the case within the Sherman Act. The evidence was found insufficient to show such an intent. Thus, the Court did not decide that a direct and intentional obstruction of interstate commerce was not a violation of the Act. In the *Second Coronado Company* case (268 U. S. 295), evidence of that intent was supplied and the Court ac-

524

cordingly set aside a judgment in favor of the local union. It is true that the Court, in dealing with the purpose of the local union, found that it was to stop the production of non-union coal and prevent its shipment to markets of other States, where by competition it would tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines. But the interstate commerce that was thus found to be directly and intentionally obstructed was the shipment of the coal, and whether the purpose was to maintain unionization in other States, or within the same State, would not seem to be material, so long as the interstate commerce in either case is directly and intentionally prevented.

The Court in the *Second Coronado Company* case not only decided the particular case but laid down the general principle as follows: "But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act." *Id.,* p. 310. The use of the disjunctive is significant.

The ruling of the *First Coronado Company* case as to a mere stoppage of production, in the absence of proof of a direct and intentional obstruction of interstate commerce, was repeated in the case of *United Leather Workers* v. *Herkert Co.,* 265 U. S. 457. But the dictum from the opinion in that case, which the Court quotes in its present opinion, must be read in connection with what immediately follows where the Court pointed out that there was no direct interference by the defendants in the *Herkert* case "with the interstate transportation" of the goods of the plaintiff company. Any doubt as to the true import of the *Coronado* and *Herkert* cases is set at rest by this Court's construction of these decisions in the

case of *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters Assn., supra.* There the Court emphasized the point as to the absence of direct interference with interstate transportation in the earlier cases, saying (274 U. S. pp. 47, 48):

"The case, therefore, is controlled, not by *United Mine Workers* v. *Coronado Co., supra,* [259 U. S. 344] and *United Leather Workers* v. *Herkert,* 265 U. S. 457, as respondents contend, but by others presently to be discussed. In the *United Leather Workers* case, it appeared that the strikes were leveled only against production, and that the strikers (p. 471) 'did nothing which in any way directly interfered with the interstate transportation or sales of the complainants' product'; and the decision rests upon the ground that there was an entire absence of evidence or circumstances to show that the defendants, in this conspiracy to coerce complainants, were directing their scheme against interstate commerce. *United Mine Workers* v. *Coronado Co., supra,* pp. 408–409, is to the same effect."

And the general principle set forth in the *Second Coronado Company* case, as above quoted, was reiterated.

In *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103, 107, there was no showing of a direct or intentional restraint of interstate commerce. But in *Local 167* v. *United States,* 291 U. S. 293, the evidence showed a conspiracy "to burden the free movement of live poultry into the metropolitan area" in New York. The Court said: "The interference by appellants and others with the unloading, the transportation, the sales by marketmen to retailers, the prices charged and the amount of profits exacted operates substantially and directly to restrain and burden the untrammeled shipment and movement of the poultry while unquestionably it is in interstate commerce." *Id.,* p. 297. Thus it was "the untrammeled shipment and movement" which, when found to be di-

rectly and intentionally restrained, was held to constitute violation of the Sherman Act.

Suppose, for example, there should be a conspiracy among the teamsters and truck drivers in New York City to prevent the hauling of goods and their transportation in interstate commerce, can it be doubted that the Sherman Act would apply? Would it not be essentially the same sort of obstruction of interstate commerce as was found to have been effected in *United States* v. *Workingmen's Amalgamated Council, supra,* where the transportation of goods in New Orleans in interstate commerce was tied up? There the defendants paralyzed local business and their object was to benefit themselves in their dealings with their employers, but to attain that end they directly and intentionally obstructed the movement of goods in interstate commerce and thus came within the interdiction of the Act. The fact that the defendants in the instant case are not teamsters can make no difference as it is the direct and intentional prevention of interstate commerce that turns the scales.

Our decisions have said much of the "free flow" of interstate commerce. What is this metaphor of an interstate stream protected in its flow by the Sherman Act but a striking way of describing the movement of goods by untrammeled shipments in pursuance of freely negotiated sales?

It was to protect this free movement from being obstructed by industrial strife through the denial of collective bargaining that Congress passed the National Labor Relations Act. In sustaining the validity of that Act we referred to our decisions with respect to the conduct of employees engaged in production, summing up the matter in this way: "And in the second *Coronado* case the Court ruled that while the mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production

is ordinarily an indirect and remote obstruction to that commerce, nevertheless when the 'intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the [Sherman] Anti-Trust Act.'" *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 40. It is true that in that case we were considering the power of Congress over interstate commerce, but we were pointing to the exercise of that power in the Sherman Act, with respect to which we had previously said "that Congress meant to deal comprehensively and effectively with the evils resulting from contracts, combinations and conspiracies in restraint of trade, and to that end to exercise all the power it possessed." *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 435. That power, and its exercise, should not be deemed to fall short of the protection of the interstate shipment of goods from conspiracies to impose a direct restraint upon it.

The attempt in the court below to distinguish between the use of the word "affect" in the National Labor Relations Act and the word "restraint" in the Sherman Act is ineffectual as it fails to take note of the fact that the word "affect" was construed as purporting "to reach only what may be deemed to burden or obstruct" interstate or foreign commerce, and hence under the familiar principle "that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power," the statute was upheld. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., supra,* pp. 31, 32.

The evil sought to be remedied by the National Labor Relations Act was the interruption of interstate commerce primarily by the prevention of the free shipment and delivery of goods in that commerce, and hence it has

been applied to those cases where industries are of such a character that the prohibited unfair labor practices would naturally have the effect of interrupting the movement of commodities between the States. See, *e. g., National Labor Relations Board* v. *Fruehauf,* 301 U. S. 49, 53, 54; *National Labor Relations Board* v. *Friedman-Harry Marks Co.,* 301 U. S. 58, 72, 73; *Santa Cruz Fruit Packing Co.* v. *National Labor Relations Board,* 303 U. S. 453, 468; *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197, 221. In *National Labor Relations Board* v. *Fainblatt, supra,* pp. 605, 606, we found that "interstate commerce was involved in the transportation of the materials to be processed across state lines to the factory of respondents and in the transportation of the finished product to points outside the state for distribution to purchasers and ultimate consumers," and that "transportation alone across state lines is commerce within the constitutional control of the National Government"; and, having said that, we pointed to the protective exercise of congressional power under the Sherman Act as not in any way restricted because the volume of the commerce involved in such transportation was small. *Id.*

It would indeed be anomalous if, while employers are bound by the Labor Act because their unfair labor practices may lead to conduct which would prevent the shipment of their goods in interstate commerce, at the same time the direct and intentional obstruction or prevention of such shipments by the employees were not deemed to be a restraint of interstate commerce under the broad terms of the Sherman Act.

This Court has never heretofore decided that a direct and intentional obstruction or prevention of the shipment of goods in interstate commerce was not a violation of the Sherman Act. In my opinion it should not so

decide now. It finds no warrant for such a decision in the terms of the statute. I am unable to find any compulsion of judicial decision requiring the Court so to limit those terms. Restraints may be of various sorts. Some may be imposed by employers, others by employees. But when they are found to be unreasonable and directly imposed upon interstate commerce, both employers and employees are subject to the sanctions of the Act.

It is said that such a view would bring practically every strike in modern industry within the application of the statute. I do not agree. The right to quit work, the right peaceably to persuade others to quit work, the right to proceed by lawful measures within the contemplation of the Clayton Act to attain the legitimate objects of labor organization, is to my mind quite a different matter from a conspiracy directly and intentionally to prevent the shipment of goods in interstate commerce either by their illegal seizure for that purpose, or by the direct and intentional obstruction of their transportation or by blocking the highways of interstate intercourse.

Once it is decided, as this Court does decide, that the Sherman Act does not except labor unions from its purview,—once it is decided, as this Court does decide, that the conduct here shown is not within the immunity conferred by the Clayton Act,—the Court, as it seems to me, has no option but to apply the Sherman Act in accordance with its express provisions.

MR. JUSTICE McREYNOLDS and MR. JUSTICE ROBERTS join in this opinion.