Charles FEATHER t/a Feather Trucking et al.

v.

UNITED MINE WORKERS OF AMERICA and District 2 United Mine Workers of America and Local 1600 United Mine Workers of America.

Civ. A. No. 76–955.

United States District Court, W. D. Pennsylvania.

June 27, 1980.

Paul R. Hirschfield, Pittsburgh, Pa., Jerald Cureton, Philadelphia, Pa., for plaintiffs.

Melvin P. Stein, Pittsburgh, Pa., Richard Trumka, Washington, D. C., for defendants.

## OPINION

KNOX, District Judge.

This suit was filed by eleven Western Pennsylvania coal haulers seeking damages on two separate theories. First, plaintiffs contend, in Count I of their amended complaint, that defendants engage in an illegal strike, an object of which was to force plaintiffs to sign a collective bargaining agreement containing a hot cargo clause in violation of § 8(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(e). Second, in Counts II and III, plaintiffs allege that defendants conspired to restrain trade and create a coal hauling monopoly in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by engaging in the strike. Jurisdiction of this court has been properly invoked under 29 U.S.C. § 187 and 15 U.S.C. § 4.

On September 13, 1977, we determined that this case should proceed as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. We defined the class to include:

"All coal haulers whose principal place of business was or is now located in Western Pennsylvania who, at any time from, on or about November 1, 1974, have been engaged in the business of coal hauling from points in Western Pennsylvania to locations in Western Pennsylvania and other locations in the United States."

We reject defendants' contentions that this class was improperly certified for the reasons set forth in the memorandum opinion and order of this court filed September 13, 1977.

On May 7, 1979, we denied cross motions for summary judgment. *Feather v. United Mine Workers of America, District No. 2, et al.,* 470 F.Supp. 606 (W.D.Pa.1979). The case was tried to the court non jury on the issues of liability only on October 9–12, 1979. Having carefully reviewed the evidence and considered the arguments of counsel, the court makes the following findings of fact and conclusions of law in accordance with FRCP 52(a).

### FINDINGS OF FACT

1. The plaintiffs are individuals, partnerships and corporations, who, at any time from on or about November 1, 1974, have been engaged in the business of coal hauling from locations in Western Pennsylvania to places within and without Western Pennsylvania. The geographical area of Western Pennsylvania is comprised of the 40 western most counties of the Commonwealth. The principal place of business of the estimated 1,000 plaintiffs is located in this geographical area.

2. Defendants, United Mine Workers of America (UMWA) District No. 2 of the UMWA, and Local Union No. 1600 of the UMWA are unincorporated associations and labor organizations within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5). Defendants represent employees who haul coal and work in and around coal mines.

3. The primary function of the UMWA is to periodically negotiate agreements on behalf of its members regarding wages, hours and conditions of employment. For more than twenty years the UMWA has engaged in collective bargaining with a multi-employer bargaining unit, the Bituminous Coal Operators Association. (BCOA). The collective bargaining agreement negotiated from time to time between the BCOA and the UMWA is known as the National Bituminous Coal Wage Agreement (NBCWA). The NBCWA is a master collective bargaining agreement. Although the BCOA negotiates the contract, the Association neither administers nor executes its terms on behalf of its members.

4. Prior to 1974, the NBCWA had not contained an express work jurisdiction clause which defined the overall scope of the UMWA jurisdiction. See the 1968 NBCWA (DX H) and the 1974 NBCWA (PX 2).

### I. THE UMWA—BCOA NEGOTIATIONS

5. In anticipation of the expiration of the 1971 NBCWA on November 12, 1974, the UMWA began preparations for the negotiations of the successor agreement. During the spring of 1974, thirteen district collective bargaining conferences involving nine hundred locally elected delegates from local unions in nineteen UMWA districts were held. At these conferences, UMWA officials solicited recommendations for the 1974 NBCWA.

6. The elimination of subcontracting of the hauling of coal by truck to non-union coal haulers was an important goal of the defendants in their negotiations of the 1974 NBCWA. Tom Bethell, a UMWA official, summarized the general viewpoint of the participants of the district conferences, as follows:

"In non-economic areas, . . . there were generally very strong feelings on the need to determine seniority on length of services alone, with no continuation of 'qualifications'; district-wide or company-wide seniority; elimination of subcontracting especially in maintenance and contract haulage; . . . ." (PX 6, p. 2)

The conferences recommended that the work jurisdiction clause of the NBCWA should be amended "to cover independent truckers". (PX 7).

7. On September 3, 1974, the formal bargaining process commenced. At the first session, the UMWA presented the BCOA with a gray bound volume of policy statements and proposals (the "Gray Book", PX 8). Under "Scope and Coverage", Section 24 of the Gray Book, the UMWA comments, as follows:

"With the possible exception of Article XIII (Seniority), there is probably no other article in the current agreement which has caused more problems, more disputes, more work stoppages and mora rank and file discontent than Article II. It is a literal mine field of explosive issues. It is confusing to the miner and to mine management. It says too much in some sections, too little in others. It is out of date in some areas, and is not designed to remedy critical issues which regularly arise."

Under the subsection, "Subleasing and Subcontracting", the UMWA commented:

"During the term of the present agreement, the jurisdictional rights of UMWA have repeatedly been infringed upon and undermined by the subcontracting of work. Because of serious problems which may result in any attempt to limit subcontracting, other than to impose an absolute ban on subcontracting, the UMWA proposes that subcontracting of unit work be absolutely prohibited. Furthermore, the Union reserves the right to resort to free collective bargaining when any employer attempts to evade the prohibition on subcontracting."

The UMWA made additional comments under the subsection, "Work Jurisdiction":

"Section (f) [of Article II of the 1971 NBCWA] is entirely inadequate to cover the existing jurisdiction of the UMWA. It does not deal with problems which have regularly recurred during the term of the 1971 agreement such as the trucking of coal from mine sites, the removal of overburden and reclamation of strip sites and the maintenance of mine roads. This section should be redrafted in its entirety to make it clear that all work related to or incident to the removal of coal from the earth, its processing, the hauling of coal from the mine site, the removal of coal waste and maintenance of gob piles, the restoration and reclamation of the mine site, the maintenance of mine roads, and all repair and maintenance work in and around the mine or at a central repair shop shall be performed solely by members of the UMWA employed by the mine owner or operator."

8. During the sixth session of the negotiations held on September 10, 1974, Rick Bank, a UMWA bargaining representative, stated that the UMWA sought to terminate the subcontracting of coal hauling to independent haulers. (PX 9A: Collective Bargaining Notes, UMWA–BCOA, 6th Session, pp. 11–12) (hereinafter "Notes").

9. On October 2, 1979, the BCOA tendered counterproposals to the UMWA proposals covering several areas of disagreement. The BCOA proposal in the scope and coverage area was taken verbatim from the 1971 NBCWA. The BCOA proposal provided, in pertinent part, as follows:

Article II—Scope and Coverage

\*     \*     \*     \*     \*     \*

Section (f) Work Jurisdiction

The following work shall be performed solely by members of the United Mine Workers of America and will be covered by this agreement:

(1) All hauling of coal, overburden, mine refuse in or about the mine, including hauling to a screening crushing, washing or other preparation facility, or other contiguous mine-related operation.

(2) All repair and maintenance work in and around the mine to the extent that the Employer has the necessary equipment at such mine or at a central repair shop where such work is normally performed and regular employees with the necessary skills available to do the work.

Nothing in this section shall be construed or applied to diminish the exclu-

sive work jurisdiction otherwise expressed or implied by this agreement. The UMWA rejected the BCOA counterproposals, including the "scope and coverage" proposal, and walked out of negotiations. (PX 9A, "Notes" 8th–14th Sessions).

10. At the request of the BCOA, negotiations resumed on October 14, 1974. On October 18, 1974, the UMWA, in response to the BCOA objections to a complete ban on subcontracting, offered the following proposal (PX 11):

### Article II
### SCOPE AND COVERAGE

Section (a) Work Jurisdiction:
Classified Work

The following work is covered by the terms of this agreement and shall be performed, in accordance with the provisions of this Agreement, exclusively by members of the United Mine Workers of America: (1) all work which is related or incident to the removal of coal from the earth; the screening, crushing, washing or processing of coal; the hauling or transporting of coal from the mine site, preparation facility or loading facility; the removal of coal waste and overburden; maintenance of gob piles on waste embankments; the restoration and reclamation of mine sites; and the maintenance of all mine roads; (2) all repair and maintenance work in and around the mine or at a central repair shop where such work is normally performed.

Nothing in this Section shall be construed or applied to diminish the exclusive work jurisdiction otherwise expressed or implied by this Agreement.

\*    \*    \*    \*    \*    \*

Section (g) Subcontracting of
Classified Work

Except as expressly provided herein, the employer shall not, during the term of this Agreement, contract out any work within the exclusive jurisdiction of the United Mine Workers of America:

(1) An employer may continue existing arrangements with trucking companies or operators who presently provide trucking

services provided that the labor costs of such trucking contractors, including both hourly rates and fringe benefit payments to their employees, are not less than those required by this Agreement.

(a) Repair work which is performed by a machine manufacturer under warranty or work which has heretofore been performed either on or off the mine site by other employers may be continued unless the employers signatory hereto have or can readily obtain without substantial expense the equipment necessary to perform such work and currently have available either regular employees or panel members who have the necessary skills to do the work.

\*    \*    \*    \*    \*    \*

11. From October 24 to November 8, 1974, the parties exchanged formal proposals on the scope and coverage issue, but made little head way in their negotiations. (See PX 12–15). On November 9, 1974, the BCOA proposed a separate work jurisdiction clause (PX 17) which provided, in pertinent part:

Work Jurisdiction (a)

The production, preparation and trucking of coal, and work customarily related thereto is the work of the United Mine Workers and shall be performed by classified employees of the employer under this agreement, and may be contracted out only in the \circumstances and under the conditions set forth in section (g) of this article.

\*    \*    \*    \*    \*    \*

Section (g) Contracting and
Subcontracting

\*    \*    \*    \*    \*    \*

(2) Trucking of Coal—The trucking of coal around the mine site, from the mine site to a preparation plant or loading facility may be contracted out to a contractor employing members of the UMWA under this agreement and where such contracting out is consistent with prior custom and practice.

(3) Repair and Maintenance Work—Repair and maintenance work customarily performed by classified employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, or (b) where the Employer does not have available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, provided however, that the work shall be performed by UMWA members to the extent and in the manner permitted by law.

\* \* \* \* \* \*

Guy Farmer, the Chief Negotiator and General Counsel of the BCOA, testified that:

" . . . we explained to the union, in presenting this proposal, that, if a contractor, in accordance with prior custom and practice, contracted out this work to a non-union operator, that it would not be, in our opinion, a violation of the contract because, if we contracted it out to a non-union operator for business reasons, we felt that he had a legal right to do that, and, therefore, it would not be a violation of the contract for him to do it, and that we intended to interpret and administer the contract that way.

"Bear in mind, BCOA does not administer the contract. It is the individual coal operator's responsibility to administer the contract. We simply—BCOA simply negotiates the contract and gives interpretations of the contract, either on its own initiative or at the request of a coal operator member." (Tr. 715–716)

12. The UMWA rejected the BCOA proposal of November 9, 1974. On November 10, 1974, the UMWA submitted its counterproposal (PX 18) which provided, in pertinent part:

"Section (g)—Subcontracting of Classified Work.

"Except as expressly provided herein, the Employer shall not, during the term of this agreement, contract out any work covered by this agreement:

"(1) An Employer may continue existing arrangements with trucking companies or operators or other transportation companies who presently provide haulage services provided that the labor costs of such contractors, including both hourly rates and fringe benefit payments to their employees, are not less than those required by this agreement and, in the manner and to the extent provided by law, are members of the UMWA covered by this agreement.

"(2) Repair work which is performed by a machine manufacturer under warranty; or other repair and maintenance work which has heretofore been performed either on or off the mine site by other employers may be continued unless the Employers signatory hereto have or can readily obtain without substantial expense the equipment necessary to perform such work and currently have available either regular employees or panel members who have the necessary skills to do the work."

13. On November 11, 1974, the expiration date of the 1971 NBCWA, the BCOA offered a revised Scope and Coverage proposal (PX 19) Section II(g) provided:

### Section (g) Contracting and Subcontracting

(1) Trucking of Coal—The trucking of coal around the mine site, from the mine site to a preparation plant or loading facility may be contracted out to a contractor employing members of the UMWA under this agreement and where such contracting out is consistent with prior custom and practice of the Employer.

(2) Repair and Maintenance Work—Repair and maintenance work customarily performed by classified employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, or (b) where the employer does not have available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, provided however, that the work shall be performed by UMWA members to the extent and in the manner permitted by law.

(3) The Employer may not contract out the rough grading in mine reclamation work.

In the negotiation session that followed the BCOA offer, the UMWA negotiators argued that the phrase "trucking of coal" contained in Section II(g)(1) of the BCOA proposal could be interpreted to exclude all other forms of transportation from the mine site to a preparation plant or loading facility. (See "Notes", PX 9C, 41st Session, p. 14–23). The UMWA negotiators concluded that the proposed language did not contain an acceptable description of the union's work jurisdiction and, accordingly, rejected the BCOA proposal.

14. With the expiration of the 1971 NBCWA on November 11, 1974, the UMWA strike began the following day in accordance with the union's constitutional mandate, "no contract, no work". On November 12, 1974, the BCOA presented a package proposal which covered all outstanding economic and noneconomic issues including the scope and coverage issues. The term, "trucking of coal", which had been included in Section II(a) of prior proposals was deleted and the language, "Haulage of coal", and, "removal of overburden", was substituted in its place. In Section II(g)(1), the term "haulage of coal" was substituted for the term "trucking of coal" (PX 20). On November 13, 1974, the parties agreed to substitute the term "transportation of coal" in lieu of "haulage of coal" in Article II, Sections (a) and (g) of the BCOA proposal of November 12, 1974. The parties reached an agreement on a tentative contract on or about 9:30 p. m., November 13, 1974.

15. The union negotiators then submitted the tentative contract for approval to the International Bargaining Council of the UMWA pursuant to Article XIX of the UMWA Constitution. The Council raised several objections to the terms of the tentative contract and directed the negotiators to renegotiate changes in five areas. No changes or modifications were requested in the Scope and Coverage provisions. On November 14, 1974, at one of the meetings of the Council, Harry Patrick, Secretary-Treasurer of the UMWA stated:

"I think that the first two Articles, Enabling Clause and Scope and Coverage, where there was a fight—and I mean a real dog fight—over each word, each word that went into that contract—because each word that went in there, it meant something that we took away from the coal operators and the management of the mines."

Mike Trbovich, Vice President of the UMWA, stated: "[The first two articles] are the most important articles in this contract." Chip Yablonski, a UMWA negotiator and attorney, stated:

"It is very difficult to write limitations on subcontracting, as a matter of fact, without violating the hot cargo provisions of the National Labor Relations Act, to draft anything in this area without having jurisdiction clearly defined.

"A major issue, and I think with all that went on here in the Executive Board over subcontracting out, and removal of overburden, I feel pretty good to say that that is clearly defined as work that is within our jurisdiction.

"We got the transportation of coal." (PX 26, pp. 280–282)

16. On November 24, 1974, the BCOA and the UMWA agreed to various changes in the terms of the tentative contract, none of which are relevant in this case. Following the vote of approval of the revised tentative contract by the Bargaining Council, it was then submitted to the rank and file. A majority of the members of the UMWA ratified the agreement and, on December 6, 1974, the union terminated striking activities directed at those companies which had executed the 1974 NBCWA.

## II. THE COAL HAULERS' STRIKE.

17. In the spring of 1974, a group of coal haulers who were signatory to the 1971 NBCWA, the Western Pennsylvania Coalhaulers Association, sought to negotiate with the UMWA for a separate coal hauling agreement. Although the parties engaged in sporadic discussions throughout the year, the UMWA refused to recognize the associ-

ation as a multi-employer bargaining agent, and consequently, the discussions never culminated in any kind of an agreement. When the 1971 NBCWA expired on November 11, 1974, the employees of the coal hauler signatories ceased working under the UMWA constitutional mandate, "no contract, no work". The UMWA and the coal hauler signatories agreed to a thirty day extension of the 1971 NBCWA, the thirty day period commencing December 30, 1974.

18. Frank Kulish, the President of District No. 2, directed the local union officials within District No. 2, by letter dated January 7, 1975, to advise "all independent truck owner-operators who are not signatory to the 1974 Wage Agreement . . . to come to the District No. 2 and sign a contract with the UMWA if they desire to continue working in and around UMWA mines." (PX 35). UMWA President Miller advised Kulish by letter dated May 29, 1974, (PX 55) to organize trucking companies in District No. 2 which:

"1. Haul coal, overburden or mine refuse in or about the mine, including hauling to a screening, crushing, washing or other preparation facility or other mine related operation;

2. Haul raw coal from surface mine pit areas to ultimate consumers;

3. Haul coal on an essentially full-time basis."

19. On January 29, 1975, negotiations between the coal haulers and the defendants having broken down, the defendants authorized a strike against those coal haulers who had refused to sign the 1974 NBCWA. President Miller appointed John Lyons, Wilbur Geary, George O'Bush and Robert Rorabaugh as temporary UMWA International Representatives to District No. 2. Miller authorized them to enlist coal haulers signatories to the 1971 NBCWA to sign the 1974 NBCWA. (PX 41, 42). Defendants attempted to organize coal haulers and urge them to sign the 1974 NBCWA, regardless of whether or not they had been signatory to the prior agreements.

20. President Miller appointed a UMWA International Commission consisting of Frank Clements, John Kelly and J. B. Trout to direct the strike and negotiating efforts. Frank Kulish circulated a memorandum to all local union officers, committeemen and members of District No. 2 concerning the strike by Local No. 1600. In the memorandum, Kulish stated that the strike must be "limited to coal haulage companies and independent truckers who have not signed the agreement." (PX 46). Kulish further stated that the International Commission had authorized picketing at the "entrance to private property used by the unsigned truckers." (PX 46). Pursuant to these instructions, agents of the defendants picketed the entrances to numerous mines worked by unsigned coal haulers.

21. On several occasions, from early December 1974, through April 1975, defendants coerced coal haulers into signing the 1974 NBCWA by means of picketing, enlisting the aid of coal mine companies to boycott non-signatories, and threatening to prohibit plaintiffs from hauling any coal unless they signed the agreement. (Tr. 46, 63–65, 70, 112–113, 123–128, 136–138, 143–145, 172–174, 180–184, 186, 188, 415, 417–431, 440–445).

During the winter months of 1974–75, the defendants held various strike related meetings in Ebensburg, Marion Center, Kittanning, New Alexandria, Clyde and Mundys Corner. At these meetings, representatives of the defendants informed the coal haulers that they must either sign the 1974 NBCWA or cease hauling coal. (Tr. 66–71, 136, 139, 143–148, 180–184, 209–221, 251–255, 417–418, 440–445, 566–567).

22. Pursuant to their plans to encourage coal haulers to sign the 1974 NBCWA, the defendants conducted a truck survey at numerous mines in Western Pennsylvania. The purpose of the survey was to determine whether coal haulers had signed the agreement. The unsigned truckers were told that they must sign the 1974 NBCWA. (Tr. 445–454).

Robert Rorabaugh, the Recording Secretary of Local No. 1600 served as a Special Representative of the UMWA from January 25, 1975 through March, 1975. In his

capacity as Special Representative, Rorabaugh's sole responsibility was to urge coal haulers to sign the 1974 NBCWA.

23. The defendants' attempts to force the coal haulers to sign the 1974 NBCWA continued through the spring of 1975. As a result of defendants' efforts, 366 coal haulers became signatory to the 1974 NBCWA. Thirty nine coal haulers were signatory to the 1974 NBCWA. (PX 61, 62).

## DISCUSSION

### I. THE NATIONAL LABOR RELATIONS ACT CLAIMS.

■ Plaintiffs contend that the provision contained in Article II(g)(1) and (2) of the 1974 NBCWA are illegal hot cargo clauses which violate Section 8(e) of the NLRA. Defendants, on the other hand, argue that the parties to the 1974 NBCWA intended these provisions to operate as lawful work preservation clauses. The clauses of the agreement in dispute provide:

"Article II: *Scope and Coverage*

Section (g)—*Contracting and Subcontracting.*

(1) *Transportation of Coal*—The transportation of coal as defined in paragraph (a) may be contracted out only to a contractor employing members of the UMWA under this Agreement and only where contracting out such work is consistent with the prior practice and custom of the employer.

(2) *Repair and Maintenance Work*—Repair and maintenance work customarily performed by classified employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty or (b) where the employer does not have the available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, provided, however, that the work at the mine or central shop shall be performed by UMWA members to the extent and in the manner permitted by law."

Section 8(e) of the NLRA provides that it is an unfair labor practice

for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer . . . agrees to . . cease doing business with any other person . . . . .

Section 8(b)(4)(ii)(B) of the Act provides that it is an unfair labor practice for a labor organization

to engage in . . . a strike . . . where . . . an object thereof is . . . (B) forcing or requiring any person to cease . . . doing business with any other person . . . . .

A strike to force an employer to sign an agreement which contains a hot cargo clause in violation of Section 8(e) is unlawful under Section 8(B)(4)(ii)(B). *Carpenters Local No. 1976 v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

■ Whether a particular clause and its enforcement violates Sections 8(e) and 8(b)(4)(ii)(B) "cannot be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work . . . ., or whether the agreements and boycott were tactically calculated to satisfy union objections elsewhere." *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967). As "surrounding circumstances", the court identified "the remoteness of the threat of displacement by the barred product or services, the history of the labor relations between the union and the employers who would be boycotted, and the economic personality of the industry." Id., at 644 n. 38, 87 S.Ct., at 1268. See also *Sheet Metal Workers Internat'l Ass'n, Local 223 v. NLRB*, 162 U.S.App.D.C. 145, 155, 498 F.2d 687, 697 (1974). We have, therefore, received the statements made during the discussions leading up to the execution of the 1974 NBCWA that directly bear upon whether the underlying purpose of the contested provisions contained therein is the primary one of protecting work for members of the bargaining unit.

■ One of the major issues in the negotiation of the 1974 NBCWA was "scope and coverage" or work jurisdiction of the UMWA. Neither the 1968 NBCWA nor the 1971 NBCWA contained express work jurisdiction clauses and the union proposed to eliminate the transportation of coal by non-union truckers. There had been no consistent policy regarding UMWA jurisdiction over trucking and the union sought to incorporate clear guidelines in the 1974 NBCWA.

The bargaining history reveals that the UMWA initially proposed a total prohibition of subcontracting of all transportation of coal from the mine sites and all repair and maintenance work. The BCOA counterproposal contained the identical language of the provisions recited in the 1971 NBCWA. When the parties reached an impasse, the BCOA proposed a contracting and subcontracting clause which provided, in part, "The trucking of coal . . . may be contracted out to a contractor employing members of the UMWA under this agreement . . ." On November 10, 1974, the UMWA submitted a counterproposal which similarly provided that companies may contract out only to contractors who employ union members. The language of which the plaintiffs complain was incorporated into the contract terms agreed to by the parties on November 13, 1974. On that date, the BCOA acceded to the UMWA's demand that the term, "transportation of coal" replace the term, "haulage of coal", in Article II, Sections (a) and (g).

Although there is some testimony by Guy Farmer, Chief Negotiator and General Counsel of the BCOA, to support defendants' contention that the negotiators did not intend to prohibit the contracting out of the transportation of coal to non-union haulers in accordance with prior custom and practice, the bargaining history clearly reveals that the BCOA and the UMWA understood and acquiesced in a secondary object for the terms of Article II(g) of the 1974 NBCWA. When the BCOA refused to accept a total prohibition of contracting and subcontracting of the transportation of coal and repair and maintenance work, the parties settled on the contract language which provides that the continuance of the relationship between the signatory employer and any contractor depends upon the contractor's decision to employ UMWA members rather than the contractor's maintenance of union wages or conditions of employment. The officers of the UMWA agreed that the terms of Article II(g) were some of the most salient features of the contract. Harry Patrick, Secretary-Treasurer of the UMWA stated that "each word that went in[to Articles I and II] . . . meant something that we took away from the coal operators and the management of the mines."

■ Defendants point out that the BCOA first proposed the offending language in Article II(g) and that the union simply agreed to modifications of the BCOA proposal. The union contends that it therefore lacked unlawful intent in negotiating for the terms of the clauses. Whether the BCOA or the UMWA initially proposed the language of the hot cargo clauses is of no significance when both parties understood and acquiesced in a secondary object for the terms. Assuming that the haulage of coal was fairly claimable by the UMWA, the union was entitled to bargain for and implement a no-subcontracting or union standards clause. When its efforts to do so failed however, the union settled for a hot cargo agreement. We make no finding with respect to whether the haulage of coal has been customarily or traditionally done by the union. Although the negotiators testified that the transportation of coal was fairly claimable by the union, the evidence clearly shows that there was no consistent policy regarding UMWA jurisdiction and the plaintiff class in the instant suit engaged in extensive coal hauling throughout Western Pennsylvania. Assuming, however, that the union was entitled to negotiate for work preservation in both the transportation of coal and the repair and maintenance areas, we find that secondary consequences flow from the clauses at issue here, in view of the economic history and circumstances of the industry, the locality and the parties.

Support for our holding is found in the Third Circuit's recent decision, *Amax Coal Co. v. NLRB*, 614 F.2d 872 (3d Cir. 1980). There, the court upheld the Board's determination that the UMWA violated the NLRA, *inter alia*, by bargaining to an impasse and striking in support of its demands that Amax agree to two contract clauses, the "Coal Transportation Clause" and the "Repair and Maintenance Work Clause", in violation of Section 8(e). The language of the clauses at issue in *Amax Coal Co.* and in this case is identical. In support of its holding, the court reasoned as follows:

"C. Coal Transportation Clause

"The coal transportation clause provided that Amax could subcontract the transportation of its coal 'only to a contractor employing members of the UMWA under their agreement.' The Board adopted the ruling of the ALJ that the Union violated Sections 8(b)(4) and 8(b)(3) by insisting to impasse and striking to obtain Amax's agreement to its coal transportation clause. We agree.

"The clause requires that the subcontractor shall not only agree to provide its employees with the economic benefits of the contract, but to adhere to the noneconomic terms as well. It also provides that Amax may contract out only to contractors who employ Union members. To that extent, the clause seeks to aid UMWA members generally rather than those union members employed at the Belle Ayr Mine. The continuance of the relationship between the signatory employer and any contractor depends on the contractor's decision to employ UMWA as his employees' bargaining representative and not on the contractor's maintenance of union wage scales or conditions. Its effect is therefore secondary and unlawful. See *A. Duie Pyle, Inc. v. NLRB*, 383 F.2d 772, 777–778 (3d Cir. 1967), *cert. denied*, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968).

"D. Repair and Maintenance Work

"The ALJ found and the Board agreed that the Union's Repair and Maintenance Work Clause proposal violated Section 8(e). The proposal prohibited contracting out repair and maintenance work customarily performed by classified employees at the mine or central shop unless the work was performed under a manufacturer's warranty or the employer did not have available equipment or regular employees with necessary skills available to perform the work at the mine or central shop, 'provided, however, that the work, shall be performed by UMWA members to the extent and in the manner permitted by law'. App. at 134a. The Board's decision will be enforced, for as this court stated in *A. Duie Pyle, Inc. v. NLRB*, 383 F.2d at 777–778:

"The present provisions, to the extent that they require the subcontractees to become employees and members of the union, therefore must also be declared invalid. As in the case of secondary boycotts generally, a union may not employ a collective bargaining agreement with one employer as a means of effectuating its object to coerce another employer to unionize. Nor may it by this means seek to coerce self-employed persons to become union members. Congress had made this clear by Section 8(b)(4)(A) which prohibits secondary boycotts with an object of 'forcing or requiring any employer or self-employed person to join any labor . . . organization. . . .' "

Id., at 614 F.2d 887, 888, footnotes omitted.

*Amax Coal Company* affirms our conclusion that the effect of these clauses is to make the continuance of the relationship between the signatory employer and any contractor depend upon the contractor's decision to employ members of the UMWA and to recognize the UMWA as his employee's bargaining representative.

■ The record shows that the defendants have violated Section 8(b)(4)(ii)(B) of the NLRA by striking to force plaintiffs to sign the 1974 NBCWA which contains the offending provisions. See *Carpenters Local*

*No. 1976 v. NLRB*, supra. The striking and picketing activities of the defendants against the coal haulers commenced upon the expiration of the 1974 NBCWA. The evidence establishes that the strike and related activities were authorized and coordinated by union officials and representatives of the defendants against the coal haulers whether or not they were signatory to the 1974 NBCWA.[1]

During the course of the trial of this case, the court received, subject to defendants' objections, evidence related to NLRB proceedings filed by some of the plaintiffs in March 1975. We now hold certain documents received in connection with these NLRB proceedings inadmissible under the Federal Rules of Evidence. The affidavit of John Lyons, PX 51, does not comply with Rule 804(b)(1) since it was not a deposition taken in compliance with law in a judicial proceeding and there was no opportunity for cross-examination. *NLRB v. McClure Associates, Inc.*, 556 F.2d 725, 726 (4th Cir. 1977). The Notices to Members, PX 58 and 59, are inadmissible under Rule 408 because they constitute the terms of settlements. In deciding the merits of this case, we have disregarded such evidence. Defendants argue that the NLRB Regional Advice Memorandum, PX 57, is inadmissible under the authority of *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). There, the Supreme Court held that Advice and Appeals Memoranda which explain decisions by the General Counsel to file a complaint and commence litigation before the Board are not subject to discovery since such Memoranda are not "final opinions" made in the adjudication of a case under 5 U.S.C. Section 552(a)(2)(A) and fall within the scope of Exemption 5 relating to "intra-agency memorandum". The issue here,

whether such Memoranda, having been lawfully obtained during discovery, are admissible, was not before the Supreme Court in *Sears, Roebuck & Co.* We have received the NLRB Memorandum for the purpose of showing that the NLRB took some action as a result of the filing of unfair labor practice charges by some of the plaintiffs in this case. Neither such charges, PX 49–50, nor the NLRB Memorandum, PX 57, were received for the purpose of proving the truth of the statements contained therein. See *UMWA v. Pennington*, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). We have not based our Findings of Fact and Conclusions of Law on any of the evidence admitted in connection with these NLRB proceedings.

## II. THE SHERMAN ACT CLAIMS

Counts II and III of plaintiff's amended complaint allege that defendants conspired to restrain trade and attempted to create a coal hauling monopoly in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by engaging in a strike to force plaintiffs to sign a contract containing a clause in violation of Section 8(e) of the NLRA. At the outset, we observe, "Drawing the line between union activity that is subject to antitrust sanctions and union activity that is subject, if at all, only to labor law and remedies will continue to be one of the most delicate, demanding tasks confronting the judiciary. St. Antoine, Connell: Antitrust Law at the Expense of Labor Law, 62 Va.L.Rev. 603, 630 (1976).

### A. The Statutory Exemption

Defendants claim that they are immune from antitrust liability under the labor exemptions.[2] The sources of the labor exemption from the antitrust laws are those provisions of the Clayton Act (15 U.S.C. § 17 and 29 U.S.C. § 52) and the Norris-LaGuardia

---

1. See Part II of the Findings of Fact; Tr. 36–47, 63–65, 71–73, 84, 123–128, 143–145, 150–157, 164–165, 171–175, 180–189, 211–224, 264–268, 307–313, 328–336, 353–354, 390–403, 408–409, 413, 429, 440–445, 502; PX 34, 35, 41, 42, 46, 56.

2. The commentator in The Supreme Court 1974 Term, 89 Harv.L.Rev. 47, 236 n. 13, finds "[t]he distinction between 'statutory' and 'nonstatutory' exemptions, however, is somewhat misleading. All the major cases involving labor's antitrust exemption have purported to accommodate the Clayton, Norris-LaGuardia, Wagner and Sherman Acts."

Act (29 U.S.C. §§ 104, 105, 113) which declare that labor unions are not combinations or conspiracies in restraint of trade and which specifically exempt certain union activities, such as secondary picketing and group boycotts, from the reach of the antitrust laws. *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–1835, 44 L.Ed.2d 418 (1975). The Supreme Court has recently cautioned that all exemptions from antitrust laws, including the labor exemption, are to be narrowly construed. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 229, 230, 99 S.Ct. 1067, 1081–1082, 59 L.Ed.2d 261 (1979); *Consolidated Express, Inc. v. New York Shipping Assn. Inc.*, 602 F.2d 494, 513 n. 17 (3d Cir. 1979).

■ The statutory exemption was designed to insulate legitimate collective activity by employees, which is inherently anticompetitive but favored by national labor policy, from the proscriptions of the antitrust laws. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The statutory exemption immunizes from antitrust liability all legitimate labor activities undertaken by a union in furtherance of its own interests *"[s]o long as the union . . . does not combine with non-labor groups."* *United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941) (Frankfurter, J., concurring). Where concerted action or agreements between unions and "non-labor groups" is involved, the statutory exemption is unavailable. *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *Ramsey v. United Mine Workers of America*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1971).

■ Defendants contend that plaintiffs have not shown any concerted action between the UMWA and the BCOA and that plaintiffs have alleged no more than a conspiracy of union members among themselves. In arguing that there was no combination or conspiracy between a labor organization and a non-labor group, defend-

ants fail to give any weight to the collective bargaining agreement itself as evidence of a conspiracy and to the context in which it was written. The beginning point of plaintiffs' claim is not the defendants' strike activity against the coal haulers but, rather the 1974 NBCWA negotiations. See *Smitty Baker Coal Co., Inc. v. UMWA*, 620 F.2d 416 (4th Cir. 1980). Unions violate the Sherman Act where agreements pursuant to collective bargaining have been the means by which the conspiracy was made and effected and the unions are not excused under the statute by engaging in traditional union types of activities such as organizing, picketing, strikes and boycotts. *Allen Bradley Co. v. Local No. 3, IBEW*, supra, 325 U.S. at 808–811, 65 S.Ct. at 1539–1540.

■ The evidence clearly shows that the BCOA first proposed the offending language contained in Article II(g) on November 10, 1974. The UMWA agreed to the general terms of the BCOA proposal and submitted a similar counterproposal the following day on November 12, 1974. The parties then agreed to the language contained in Article II(g) of the 1974 NBCWA. We have previously concluded that Article II(g) is not directed at work preservation but rather at acquiring work from the employees of a secondary employer.

Plaintiffs have further shown that the effect of these provisions contained in Article II(g) was to drive many of the coal haulers in Western Pennsylvania out of business because they could not afford to meet the terms contained therein. Furthermore, the coal operator signatories to the agreement were, under the terms of the agreement, prohibited from subcontracting coal hauling to independent haulers. While the BCOA may not have had a predatory purpose against the independent haulers, it was willing to sacrifice the interests of the coal haulers, secondary targets, in the bargaining process. The natural effect of the agreement was to lessen, if not destroy competition in the coal hauling business. The extent of plaintiffs' damages, if any, must await trial on the merits. We decline to make any findings with respect to the

issue of damages in this proceeding. We hold only that plaintiffs have proven that the 1974 NBCWA involved concerted action between the BCOA and the UMWA and therefore defendants are ineligible for the statutory antitrust exemptions provided in the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52 and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, 113. *UMW v. Pennington*, 381 U.S. 657, 661–62, 85 S.Ct. 1585, 1588–1589, 14 L.Ed.2d 626 (1965).

## B. The Non-Statutory Exemption

Defendants further maintain that the 1974 NBCWA falls within the non-statutory labor exemption, defined by the Supreme Court in the series of cases beginning with *Apex Hosiery v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), and culminating in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The issue is whether a contract which has been adjudicated to be a violation of the prohibition in Section 8(e) against contracts calling for secondary boycotts, can nevertheless be held to be within the non-statutory antitrust exemption because it was negotiated as part of a collective bargaining agreement. In their conspiracy allegations, the plaintiffs sought to identify their claims both factually and legally with *Connell*. Accordingly, any discussion of the conspiracy claims and the non-statutory exemption must begin with an analysis of the *Connell* decision itself.

In *Connell*, a labor organization coerced a general contractor into an agreement to hire only those subcontractors who had a collective bargaining agreement with it. Since Connell subcontracts all plumbing and mechanical work, the union disclaimed any interest in representing Connell employees. The contractor sued to invalidate the agreement under Sections 1 and 2 of the Sherman Act. The case did not involve a collective bargaining agreement and so, as Justice Powell noted, considerations peculiar to the collective bargaining context were absent. "There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be

entitled to an antitrust exemption if it were included in a lawful collective bargaining agreement." 421 U.S. at 625–26, 95 S.Ct. at 1836–1837.

Since Connell and the union had executed an agreement, the court held that the statutory exemption for a union acting alone did not apply. See *U. S. v. Hutcheson*, supra. The issue was whether the union's subcontracting agreement dealt with wages, hours, and working conditions or whether it constituted only a direct restraint on the product market. The court found that the challenged agreements with general contractors "did not simply prohibit subcontracting to any nonunion firm; they prohibited subcontracting to any firm that did not have a contract with Local 100." 421 U.S. at 624, 95 S.Ct. at 1836. While the agreements may have been calculated to eliminate competition over wages and working conditions, their effect, the court concluded, would be to drive out of the market all nonunion subcontractors, whether or not they met union standards for wages and working conditions. "The union thus had complete control over subcontracting work offered by general contractors that had signed these agreements." 421 U.S. at 624, 95 S.Ct. at 1836.

In *Connell*, the court explicitly stated that there was no evidence of a union-employer conspiracy with the predatory purpose of driving out competition. "The record contains no evidence that the union's goal was anything other than organizing as many subcontractors as possible." 421 U.S. at 625, 95 S.Ct. at 1836. Connell did not argue the case on a conspiracy theory and only relied on the multiemployer agreement as an additional "factor enhancing the restraint of trade implicit in the subcontracting agreement it signed." 421 U.S. at 625 n. 2, 95 S.Ct. at 1836. While the court recognized the legality of the union's goal in organizing subcontractors, it condemned the "methods" the union has chosen. The court further held that the construction-industry proviso to Section 8(e) does not allow this type of agreement and that federal antitrust law pre-empts state antitrust law

that is closely related to organizational activities.

In this case, plaintiffs have not alleged that defendants conspired with the BCOA and unionized subcontractors to force non-union subcontractors from the market. The plaintiffs have, on the other hand, alleged that the defendants were acting in pursuit of their own labor policies and not at the behest of any employers.

Although plaintiffs have alleged that the BCOA lacked any predatory purpose against them, plaintiffs have failed to give any weight to the collective bargaining agreement itself as evidence of a conspiracy and to the context in which it was written. In *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640, Justice White, announcing the judgment, in an opinion joined by Chief Justice Warren and Justice Brennan, stated that if a union demanded, and an employer agreed to, an anticompetitive restraint designed to protect an interest nor a mandatory subject of bargaining, the antitrust exemption probably would not apply.

The evidence shows that the BCOA initially proposed the 1971 NBCWA contract language during the "scope and coverage" negotiations. The UMWA counterproposed a total ban on the subcontracting of repair and maintenance work and the transportation of coal. The offending language contained in the challenged provisions was then proposed by the BCOA. On the record before us, we cannot infer predatory intent under Justice White's "source test", since it is unclear whether the challenged provisions were union-motivated or employer-motivated and the plaintiffs have not pressed the conspiracy theory in this suit.

We have however, included extensive evidence of the 1974 NBCWA negotiations in the Findings of Fact since evidence of the source of the challenged provisions provides guidance in determining their relation to mandatory subjects of bargaining. See St. Antoine, Connell: Antitrust Law at the Expense of Labor Law, 62 Va.L.Rev. 603, 614–615 (1976).

Defendants contend, based upon plaintiffs' allegations and the evidence produced at trial that plaintiffs' remedies, if any, are provided exclusively by the labor laws. The defendants cite language in *Allen Bradley Co. v. Electrical Workers*, 325 U.S. 797, 810, 65 S.Ct. 1533, 1540, 89 L.Ed. 1939 (1945), which they read to mean that a union commits a violation only when it "aid[s] and abet[s] manufacturers and traders in violating the Sherman Act." This argument tracks the dissenting opinions in *Connell* and was expressly rejected by Justice Powell in the Majority Opinion. In *Connell*, the court concluded that the union had used direct restraints in the commercial market to achieve its concededly lawful organizational objective.

The *Connell* requirements for antitrust exemption are, "first, that the market restraint advance a legitimate labor goal, and, second, that the agreement restrain trade no more than is necessary to achieve that goal." *Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494, 517–518 (3 Cir. 1979), probable jurisdiction noted, 444 U.S. 822, 100 S.Ct. 41, 62 L.Ed.2d 28. In *Consolidated Express*, the Third Circuit interpreted the opinions of the Six Justices comprising the majority in *Meat Cutters v. Jewel Tea Co.*, supra, to mean "that when a collective bargaining agreement imposed restraints upon the employer's product market, the most significant issue in determining the availability of the labor exemption was whether the restraint involved a mandatory subject of collective bargaining. "Despite its explicit distinction of the collective bargaining situation, the *Connell* mode of analysis is similar to that of the *Jewel Tea* majority." 602 F.2d at 517.

In *Larry v. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 609 F.2d 1368, 1373 (1979), the Third Circuit interpreted *Connell*, as follows:

"We understand *Connell* to hold, then, that an agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market,

and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny."

The court pointed out that "the significant labor law factors" arising from the collective bargaining relationship were not present because the agreement at issue in *Muko* was outside the context of the collective bargaining relationship. The "significant labor law factors" were identified by the court in *Consolidated Express* and we, therefore, must analyze the non-statutory antitrust exemption defense under the guideposts set forth in that decision.

In *Consolidated Express*, the plaintiff freight consolidators brought suit against the New York Shipping Association (NYSA), an association of employers who engage in businesses related to the passage of freight through the Port of New York, and others, for, *inter alia*, alleged violations of the antitrust laws. Plaintiff alleged that the defendants' enforcement of the Rules of Containers and the Dublin Supplement constituted a group boycott of the plaintiff under Sections 1 and 2 of the Sherman Act and sought treble damages pursuant to Section 4 of the Clayton Act, for injury to their business or property resulting from that boycott.

A brief review of the litigation between and among the parties is essential to an understanding of the issues in *Consolidated Express* and its relevance to the issues in this case. The NYSA conducts collective bargaining negotiations and enters into collective bargaining agreements with various labor organizations, including the defendant International Longshoremen's Association, AFL–CIO (ILA), a labor organization representing longshoremen in the Port. The rules on Containers were adopted in 1969, by the NYSA and ILA, as a part of their collective bargaining agreement. Those rules conferred upon the ILA all stuffing and stripping work and applied to all containers originating from or to be shipped to a point within fifty miles of each dock covered by the agreement and further provided for a penalty against violators of the Rules.

Shortly after the Rules became effective, a consolidator who was similarly situated to plaintiff Consolidated Express, challenged the Rules violative of the Sherman Act and, at the same time, filed unfair labor practice charges before the NLRB. In the antitrust action, the Second Circuit reversed the district court's entry of a preliminary injunction prohibiting the NYSA and ILA from refusing to handle containers stuffed or stripped by the plaintiff, holding that there was little likelihood of success on the merits, because the agreement, including the Rules, probably fell within the labor exemption to the antitrust laws. See *Intercontinental Container Transp. Corp. v. New York Shipping Ass'n*, 426 F.2d 884 (2d Cir. 1970) (ICTC). In ICTC's unfair labor practice case, the Regional Director refused to issue a complaint and the General Counsel denied the appeal.

The Rules were not consistently enforced and plaintiffs were therefore able to continue the business of consolidating. In January, 1973, ILA and an employer bargaining unit composed of NYSA and other employer associations executed the Dublin Supplement which provided for the enforcement of the Rules against the consolidators. It provided that off-pier consolidators operating within fifty miles of the Port were to be considered as operating in violation of the Rules and further provided for the establishment and circulation of a list of the violators. These penalties were enforced against the plaintiffs.

In June, 1973, plaintiffs, faced with the destruction of their businesses, filed charges with the NLRB. Plaintiffs alleged that by agreeing to the Rules and the Dublin Supplement, NYSA and ILA had violated Section 8(e) of the NLRA, and that by seeking to enforce the same ILA had violated Section 8(b)(4)(ii)(B) of the Act. The NLRB found that the agreement embodied in the rules and the Dublin Supplement to be a violation of Section 8(e) and that ILA's

actions in enforcing the agreement were unfair labor practices under Section 8(b)(4)(ii)(B). *Consolidated Express, Inc.,* 221 NLRB No. 144 (1975) and the Second Circuit enforced the Board's order. *International Longshoremen's Association v. NLRB,* 537 F.2d 706 (2d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 1753, reh. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 589 (1977). This concludes the pre-litigation history of the parties.

Plaintiffs filed a motion for partial summary judgment on the antitrust claim, contending that the Section 8(e) violations removed the antitrust exemption and that the Rules and Dublin Supplement comprised a per se illegal group boycott directed against the plaintiffs. The trial court denied plaintiffs' motion and, on appeal, the court, reversed, and posited the Section 4 collective bargaining exemption defense:

"  .  .  .  Where, as here, a collective bargaining agreement, or conduct taken pursuant to it, has been shown to be illegal under federal labor law, a secondary party injured in his business or property by either has made out a prima facie case under Section 4. At that point, to accommodate the labor policy favoring collective bargaining, the defendants may assert, first, that at the time they acted (here, the Dublin meeting and later) they could not reasonably have foreseen that the subject matter of the agreement being challenged would be held to be unlawful under Section 8(b)(4) or Section 8(e). If they fail to prove that the illegality determination was unforeseeable, the defendants should not be exempt from liability for damages under Section 4. A successful showing that the determination of illegality was not reasonably foreseeable is not alone enough to establish an exemption defense, however, for *Jewel Tea* suggests that the defendants must also demonstrate that the contract provisions and steps taken to implement them were "intimately related" to the object of collective bargaining thought at the time to be legitimate, and went no further in imposing restraints in the secondary market than was reasonably necessary to accomplish it. Thus our test for the collective bargaining exemption defense to Section 4 liability is conjunctive, and objective, and the defendants have the burden on all elements of going forward and of persuasion. The limited Section 4 exemption defense we now recognize obviously is unavailable to defendants shown to have acted with the predatory intent against secondary targets referred to in *Pennington* and *Allen Bradley*."

602 F.2d at 521. The court emphasized that a Section 4 remedy is effective as a deterrent "only when its application to an agreement can be foreseen by the parties at the time they are engaged in collective bargaining." 602 F.2d at 520.

▉  In this case, we have held that Section II(g) of the 1974 NBCWA is violative of Section 8(e) and that defendants' actions to enforce these provisions is unlawful under Section 8(b)(4)(ii)(B) of the NLRA. Our holding forecloses the argument that the object of the challenged provisions is a mandatory subject of collective bargaining since an agreement that violates Section 8(e) cannot meet that standard. *Consolidated Express, Inc. v. New York Shipping Assoc.,* supra, 602 F.2d at 513. Plaintiffs have, therefore, made out a prima facie case under the *Consolidated Express* test.

▉  Plaintiffs have neither alleged nor have we found that defendants and the BCOA have acted with predatory intent against the plaintiffs and, accordingly, the Section 4 exemption defense is available. The defendants have the burden of going forward and persuasion on all of the elements of the defense.

Turning to the facts in this case, we find that the UMWA sought the elimination of subcontracting of both the repair and maintenance work and the transportation of coal. The position of the UMWA in the 1974 NBCWA negotiations was simply that such work was traditionally within the union's jurisdiction. In its initial proposal of September 3, 1974, the UMWA proposed an

absolute ban on subcontracting. Whether the BCOA was willing to sacrifice the interests of the plaintiffs in exchange for concessions on other bargaining issues or reasonably believed that its proposal of November 9, 1974 was lawful, as testified to by the Chief Negotiator of the BCOA, we find that the UMWA believed that such work was within its work jurisdiction. Although defendants did not present statistical evidence which would indicate the percentage of such work engaged in by union members, the testimony of many of the negotiators supports this finding. More significantly, however, there was no warning which could have alerted reasonable collective bargainers to a Section 8(b)(4) and Section 8(e) risk. In *Consolidated Express*, the court pointed out that an NLRB decision which held the Rules were illegal over a year before the negotiation of the Dublin Supplement provided the notice to defendants of labor law violations. The UMWA was not alerted to such problems in 1974, since the "scope and coverage" provisions which were contained in prior agreements had not been challenged. We find that the UMWA has proven that during the 1974 NBCWA negotiations the illegality determination was unforeseeable.

Defendants must also demonstrate that the steps taken to implement Article II(g) "were thought at the time to be legitimate, and went no further in imposing restraints in the secondary market than was reasonably necessary to accomplish" the object of the offending provisions. *Consolidated Express, Inc. v. New York Shipping Association*, supra, 602 F.2d at 521.

Plaintiffs offered extensive evidence in support of its allegations that defendants engaged in a strike and strike-related activities against the coal haulers from November 12, 1974, through the Spring of 1975. 366 coal haulers became signatory to the 1974 NBCWA; a ten-fold increase from 1971. On several occasions, defendants coerced coal haulers into signing the agreement by means of picketing, enlisting the aid of coal mine companies to boycott non-signatories, and threatening to prohibit the plaintiffs from hauling any coal unless they signed the contract. We have previously held that such unlawful actions constitute Section 8(b)(4) violations. We have concluded that the effect of these provisions was not to preserve the previously undefined work jurisdiction of the plaintiffs but rather to acquire non-union work. The methods employed by plaintiffs to further these illegal ends were directed by UMWA President Miller and other officials of the defendants. Defendants, however, went no further in imposing restraints in the coal hauling market than was reasonably necessary to accomplish its goal. Although the result of defendants' illegal actions was to expand its work jurisdiction, Article II(g) by its own terms, applied only to mines under contract with the UMWA and to no other mines.

The illegal agreement arose out of subcontracting practices, a mandatory subject of bargaining, *Fibreboard Paper v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In *Consolidated Express*, the Circuit held that both the Rules which deal with work acquisition and the Dublin Supplement which dealt with a customer boycott were not immunized from antitrust scrutiny. In this action, the violation is limited to work acquisition and we decline to extend the holding of *Consolidated Express* to reach this violation. "If we eliminate entirely the element of foreseeability, and allow a Section 4 treble damage recovery wherever the agreement is found to be illegal, the scales tilt too far away from the national interest in collective bargaining over arguably legitimate subject matters." Id., at 521.

We are mindful of the Third Circuit's admonition that "Sections 8(b)(4) and 8(e) [of the NLRA] reinforce rather than conflict with the basic policy of the antitrust laws, and suggest a cautious approach to the recognition of a non-statutory antitrust exemption for conduct in violation of their prohibitions." Id., at 513. We conclude, however, that the Section 4 damage remedy is inappropriate where, as here, the defendants have satisfied the requirements of the non-statutory exemption defense.

In light of our holding that defendants' actions fall within the non-statutory exemption to the federal antitrust laws, we do not reach the merits of plaintiffs' claims under traditional antitrust analysis. We have not addressed therefore, several issues, including the proper standard of antitrust liability, the application of the clear proof standard with respect to the authority of various agents to act on behalf of defendants and the application of the preponderance of the evidence test as to other facts under *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).

## CONCLUSIONS OF LAW.

1. Jurisdiction in this court is properly invoked under 29 U.S.C. Section 187 and 15 U.S.C. Section 1, et seq.

2. The provisions contained in Article II(g) of the 1974 NBCWA are illegal hot cargo clauses. 29 U.S.C. Section 158(e). By striking to force coal mine companies and coal haulers to sign the agreement, defendants violated the secondary boycott provisions of the NLRA, 29 U.S.C. Section 158(b)(4)(ii)(B).

3. Plaintiffs have made out a *prima facie* case for recovery of damages under 15 U.S.C. Section 15.

4. Defendants' actions do not fall within the statutory exemptions to the federal antitrust laws. 15 U.S.C. Section 17, 29 U.S.C. Section 52, 29 U.S.C. Sections 104, 105, 113.

5. Labor's non-statutory exemption from the antitrust law precludes liability of the defendants. *Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494 (3rd Cir. 1979).